CARL M. WORLEY AND CONSTANCE M. WORLEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Worley v. Commissioner
Docket No. 2888-78.
United States Tax Court
T.C. Memo 1980-51; 1980 Tax Ct. Memo LEXIS 532; 39 T.C.M. (CCH) 1090; T.C.M. (RIA) 80051; February 27, 1980, Filed John D. Houston II,James M. Houston, and Thomas E. Lippard, for the petitioners. Carmen J. SantaMaria, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies of $18,271.19 and $13,386.21, in petitioners' Federal income tax for 1972 and 1973, respectively. Due to concessions by the parties, the only issues remaining for decision are: 1. Whether expenses petitioners incurred in operating, maintaining, and housing their airplane are deductible in full under section 162, [1]/ or deductible under section 183(b) only to the extent of gross income derived from leasing the airplane. *535 2. Whether petitioners are entitled under sections 38, 46, and 48 to a credit of $6,074.72 against their Federal income tax for 1972. FINDINGS OF FACT At the time their petition was filed, petitioners Carl M. Worley (petitioner) and Constance M. Worley (Constance) were legal residents of Bethel Park, Pennsylvania. They filed joint Federal income tax returns for 1972 and 1973 with the Internal Revenue Service Center, Philadelphia, Pennsylvania. Carl M. Worley, M.D., Plastic & Reconstructive Surgery, Ltd. (the Worley Corporation) is a Pennsylvania professional corporation, of which petitioner is the sole shareholder. During the years 1972 through 1977, petitioner was employed by the Worley Corporation as a plastic surgeon. From 1963 through 1967, petitioner learned to pilot an airplane. Since about 1967, he has been a member of the Flying Physicians, an organization of physicians involved in aviation. The organization holds seminars at which papers on either aviation or medicine are presented. Petitioner subscribes to several aviation periodicals, journals, and magazines. In or about 1967, petitioner, jointly with his flight instructor, purchased a twin-engine Apache *536 airplane which he owned for about 2-1/2 years. Wanting to own a safer airplane, he next decided to buy a twin-engine Cessna Skymaster. The latter was purchased by the Worley Corporation for approximately $23,000 or $24,000. It was used for petitioner's transportation to meetings as well as for his personal use. Neither plane was ever leased to third parties. Wishing to own an airplane faster than the Cessna, petitioner decided to buy a multi-engine six-passenger Aerostar 600 (Aerostar). Before making his decision, he talked to acquaintances who were either commercial pilots or in the aircraft leasing business. In March or April 1972, petitioner discussed with his accountants, Sheppard and Company, C.P.A., the possibility of purchasing an Aerostar and leasing it. The accountants neither independently investigated possibilities of leasing nor independently projected revenues and expenses from an aircraft leasing business. To avoid violations of the professional corporation law of Pennsylvania, the accountants suggested that the plane not be used by the Worley Corporation and that leasing activities and attendant records be maintained separately from those of the professional *537 corporation. In April 1972, petitioners purchased an Aerostar from Navco International, Inc., for $86,500. Petitioners paid $281.65 to Runway Five Aviation, Inc. (Runway) for the purchase and installation of a stereo system for the airplane. Petitioners also arranged for installation of an alternate air source in order that the airplane could qualify for an air taxi operation.[2]/ The purchase of the Aerostar was financed in part with a $78,000 loan from Mellon National Bank & Trust Co. (Mellon). In connection with the loan application, the bank required to written projections of rentals anticipated from an aircraft leasing operation but only petitioners' personal financial statements. About 2 or 3 months after they purchased the Aerostar, petitioners sold the Cessna. By a letter dated June 1, 1972, petitioner requested that Susan Rockman (Rockman), an attorney, draw up a lease between Carl M. Worley Air Lease Co. (Worley Air Lease Co.) and Runway. As outlined in the letter, *538 the lease was to provide in part that, as of May 1, 1972, William Miller (Miller) of Runway would lease the Aerostar at a rate of $45 per hour and would guarantee a minimum usage of 10 hours per month. [3]/ Furthermore, petitioner would pay $175 per month to house the aircraft at the Runway hangar. Petitioner was to be notified "as soon as practical" when the aircraft was to be chartered and Runway was to be "notified in advance, as soon as practical," when petitioner wished to have the Aerostar for "personal use * * * such as attending medical meetings, personal and business trips, instrument training, and maintaining proficiency." By an invoice dated June 8, 1972, the Worley Air Lease Co. billed Runway for "10 hours guaranteed time Aerostar 7484s" at a rate of $45 per hour. A handwritten note on the invoice states: Carl I cannot give guarantee on your A/C. I have agreed to 45/Hr net rental when available and you are not using A/C. W. Miller By a letter *539 dated September 6, 1972, petitioner informed Rockman that a lease was not needed as Miller was "unable to guarantee the ten hours of usage." On or about September 25, 1972, petitioners filed a statement under the Pennsylvania Fictitious Names Act indicating that their aircraft leasing activities would be carried on under the name Worley Air Lease Co. During 1972 petitioners leased the Aerostar to the Worley Corporation at a rate of 75 cents per mile. In connection with setting this rate, the accountants obtained information from those in the air transportation business. After determining the rate, the accountants examined the Runway price list to verify that the charge was reasonable. Charges to the Worley Corporation totaled $5,376 in 1972. [4]/ Except for the April 12, 1972, trip from Richmond, Virginia, to Charleston, South Carolina, for which the Worley Corporation hired a pilot supplied by Aero Indusstries, the airplane was piloted by petitioner on all these trips. *540 At the suggestion of a friend, petitioner contacted Midwest Air Charter, Inc. (Midwest), on or before September 6, 1972, with respect to leasing the Aerostar. Midwest used Aerostars for delivery of banknotes and checks. In 1972, petitioners leased the airplane to Midwest at a rate of $60 per hour for each hour of flight time. Midwest flew the plane for 39.6 hours that year. During 1973, petitioners leased the Aerostar to the Worley Corporation at a rate of 75 cents per mile, with charges totaling $8,724.75. [5]/ Petitioner piloted the aircraft on all these occasions. *541 In 1973, petitioners continued to offer the plane for lease through Midwest. On March 10, 1973, petitioners, d/b/a Worley Air Lease Co., and Runway entered into an agreement, under which petitioners were to pay $150 per month as a hangar fee and Runway was to pay $60 per hour for each hour petitioners' airplane was flown while in the custody of Runway. This agreement contains a provision which permitted petitioners to use the Aerostar "at any time" for their "business or personal use" and to rent the aircraft to third parties. Petitioners were obligated "to the extent possible" to give Runway advance notice of any such scheduled use. Other provisions required Runway to obtain petitioners' consent before using the aircraft and to obtain their written consent before subletting the airplane. Runway did not lease the airplane in 1973. Runway leased airplanes in two ways: (1) For training, leasing to individuals who did not own aircraft and wished to learn to fly and (2) for air taxi operation, leasing to the public, generally corporations needing aircraft to transport their executives. Runway owned approximately 90 percent of the planes which it leased; the remaining 10 percent *542 were leased from owners. Most of those it owned were single-engine, two-to-four-passenger aircraft. It rarely owned airplanes similar to the Aerostar. Except when they have guaranteed minimum usage of aircraft leased from others, air transportation operators such as Runway usually attempt to lease to the public airplanes which they own before leasing those owned by others and held by the operators for sublease to the public. On December 24, 1973, petitioners and Richard H. Niehaus (Niehaus), an acquaintance of petitioner's, entered into an agreement for the lease of the Aerostar at a rate of $60 per hour flown. Under the lease, Neihaus agreed to return the aircraft "for the most part" for petitioners' "personal use on the weekend." He further promised neither to sublet nor to permit use by other parties without petitioners' prior written consent. If he required possession when petitioners intended to use the aircraft, Neihaus guaranteed a minimum daily hourly rate of up to 2 hours. Niehaus did not lease the airplane in 1973. From December 1973 until March 1974, the Aerostar was being repaired and was unavailable for use. In 1974, petitioners leased the Aerostar to the Worley *543 Corporation at a rate of 75 cents per mile, for total charges of $6,474.75. [6]/ Petitioner was the pilot for all these flights. Under the 1973 agreement, Runway leased the Aerostar once in 1974; petitioners were paid $36 when a wedding was performed on the airplane. By a letter dated January 3, 1974, and addressed "Dear Aerostar Owner," Richard E. Foy (Foy), Western Air Industries, wrote petitioners with respect to leasing the Aerostar from May 1, 1974, until September 1, 1974. In the letter, Foy guaranteed a minimum of 200 hours *544 use at a rate of $70 per hour for the 4-month period; hours over 200 were to be at a rate of $60 per hour. In addition, he guaranteed $8 per hour for all hours flown as engine reserve for overhaul. Foy concluded the letter with the following paragraph: I am also interested in purchasing one additional aircraft for my own use, no trade-in's involved. I am not a dealer hoping to steal yours but have cash to purchase. With respect to the lease, Foy was acting on behalf of Conair. By a letter dated March 25, 1974, petitioner accepted Foy's offer to lease the aircraft, subject to certain conditions. He further stated as follows: I am not interested in selling the aircraft at this time. However, I would entertain your offer after you have seen the aircraft. By a letter to Foy dated April 12, 1974, petitioner outlined insurance coverage possibilities for the period of the lease. Foy canceled the agreement shortly before the Aerostar was to have been delivered to him. In 1974, the Internal Revnue Service began an audit of petitioners' Federal income tax returns for 1972 and 1973.
In the latter part of 1974, petitioner's accountants draw his attention to the failure of Worley *545 Air Lease Co. to operate at a profit. Their discussions led to no changes in operations. Petitioners leased the Aerostar to the Worley Corporation at a rate of 75 cents per mile, with charges for 1975 totaling $4,485. [7]/ Carl was the pilot for all these flights. On April 22, 1975, Worley Air Lease Co. and Milrock, Inc., entered into a 12-month lease. Under this lease, the Aerostar was to be housed in Milrock's hangar at a rate of $150 per month and Milrock agreed to pay $50 per flight hour if it leased the airplane. During 1975, petitioners also leased the airplane to Special Jet Service, Inc. (Special Jet), at a rate of $50 for each hour of flight time, with total charges *546 of $3,755.20. [8]/ In 1976, petitioners leased the Aerostrar to the Worley Corporation at a rate of 75 cents per mile, with total charges of $3,467.25. [9]/ Carl piloted the airplane on all these occasions. Petitioners, d/b/a Worley Air Lease Co., under an unexecuted lease, agreed to lease the Aerostar to Niehaus, d/b/a Niehaus Air Systems, at a rate of $75 per hour of flight time. Other terms of this lease were *547 identical with the above-mentioned terms of the December 24, 1973, lease. Under this lease, petitioners were paid $354 for 5.9 hours of flight time in 1976. Niehaus Air Systems, which owns about 70 to 80 percent of its airplanes and leases 20 to 30 percent, rents to individual pilots for flight lessons, personal pleasure, and business trips but does not maintain an air taxi operation. In 1976, at the suggestion of the appellate conferee, Marshall Gorr, an employee of Sheppard and Co. who acted as petitioner's accountant, prepared a Projection of Results of First Year of Operations. According to the projection, which purported to be based on petitioner's expectations when the Aerostar was purchased in 1972, a first year loss would have been $7,167, with income of $35,400 from "500 hours per year dry rental [10]/ guaranteed by North Carolina Clothing firm arranged by Runway Five Aviation, Inc., personnel, 500 hours at $60 per hour" [11]and "120 hours per year dry rental guaranteed by Runway Five Aviation, Inc., 120 hours at $45 per hour" and expenses totaling $42,567. Under the projection, the first year loss was attributed in part to accelerated depreciation and did not *548 reflect use of the aircraft by others, including the Worley Corporation. During 1977, petitioners leased the Aerostar to the Worley Corporation at a rate of 75 cents per mile, with the exception of one trip at the rate of 90 cents per mile and two trips at the rate of 95 cents per mile. Charges for these flights, on all of which petitioner served as pilot, totaled $7,680.40. [12]/ *549 Petitioners also leased the airplane to Niehaus Air Systems in that year at a rate of $88 per hour of flight time. Niehaus Air Systems paid petitioners $2,701.60 for 30.7 hours of flight time. From 1972 through 1977, petitioner did not pilot the airplane while it was flown by Midwest, Runway, Special Jet, Niehaus, or Niehaus Air Systems. Petitioners were unable to lease the airplane to any other individual or organization. During these years, they managed aircraft leasing activities from their home. Worley Air Lease Co. had its own bank account and stationery. The stationery gave a North Carolina address as a second address. Worley Air Lease Co. maintained neither a business office nor a listing in the white pages or yellow pages of any telephone directory. Petitioners deducted $121.87, $150, and $45, respectively, as business promotion expenses on the Schedules C of their 1972, 1974, and 1975 Federal income tax returns. Worley Air Lease Co. did not incur any other direct advertising or promotional expenses during the years 1972 through *550 1977. Neither petitioners nor Worley Air Lease Co. employed a licensed commercial pilot. Petitioner was not a licensed commercial pilot during this period. From 1972 through 1977, petitioner devoted much less time to aircraft leasing activities than he did to his plastic surgery practice. During this period, the Aerostar was moved several times to different hangars. At least during 1972 and 1973, the Aerostar was not licensed by the Federal Aviation Agency for use as an air taxi. Although Joseph Sabol (Sabol), an employee of Runway from 1971 to 1976 and of Niehaus Air Systems from January 1976 to the present, advised petitioner to lease the aircraft directly to the public through his own air taxi operation rather than indirectly through operators, petitioners never changed their method of leasing the airplane to the public. From April 8, 1972, to April 8, 1973, the Aerostar was insured by Ranger Insurance Company; petitioner and Runway were named as the insured. Under this agreement, the airplane was insured during periods when piloted by petitioner, by "multi-engine rated private or commercial pilots" who had logged specified minimum hours in specified aircraft, and in the *551 case of "passenger carrying for hire use," by "multi-engine rated commercial pilots" who had logged specified minimum hours in specified aircraft. On September 18, 1972, the agreement was modified to delete coverage of "passenger carrying for hire use." From April 9, 1973, to December 31, 1977, insurance maintained on the Aerostar did not cover the airplane when it was leased to other parties or when it was flown by individuals other than petitioner. During the years 1972 through 1977, petitioners' income from sources other than their aircraft leasing activities was as follows: Year
Amount
1972
$87,205.01
1973
88,640.47
1974
83,391.94
1975
$ 94,120.00
1976
114,763.00
1977
113,353.00
On Schedules C of their income tax returns for the years 1972 through 1977, petitioners reported total receipts from their airplane leasing activities. The total receipts were derived from the following sources and in the following amounts: 1972
1973
1974
1975
1976
1977
Worley
Corp.
$5,376.00
$ 8,724.75
$6,474.75
$4,485.00
$3,467.25
$ 7,680.40
Personal
Use
1,446.00
895.83
1,300.48
1,203.80
1,358.75
713.00
Midwest
898. 00
978.00
0
0
0
0
Runway
0
0
36.00
0
0
0
Special
Jet
0
0
0
3,755.20
0
0
Niehaus
Air
Systems
0
0
0
0
354.00
2,701.60
Total
$7,720.00
$10,598.58
$7,811.23
$9,444.00
$5,180.00
$11,095.00
*552 Expenses and net losses for each year were as follows: 1972
1973
1974
Expenses
32,021.72
$36,946.22
$32,348.00
Gross Receipts
7,720.00
10,598.58
7,811.23
Net Loss
$24,301.72
$26,347.64
$24,536.77
1975
1976
1977
Expenses
$24,089.00
$23,870.00
$24,053.00
Gross Receipts
9,444.00
5,180.00
11,095.00
Net Loss
$14,645.00
$18,690.00
$12,958.00
By a notice of deficiency dated December 23, 1977, the Commissioner disallowed the amounts of net losses attributable to aircraft leasing activities which petitioners deducted on their 1972 and 1973 Federal income tax returns as well as the amount of an investment credit claimed in the former year. The rationale for disallowing these items was that the losses were not incurred in connection with carrying on a trade or business for profit. ULTIMATE FINDING OF FACT Petitioners' aircraft leasing activities were not engaged in for profit. OPINION 1. Aircraft Leasing Expense Deductions
In April 1972, petitioners bought the Aerostar for $86,781.65. In September of that year, they set up the Worley Air Lease Co., by which their aircraft leasing activities were conducted. From 1972 *553 through 1977, the airplane was leased many times to the Worley Corporation, petitioner's wholly-owned professional corporation. Petitioner piloted the aircraft on all but one of these flights. In addition, on numerous occasions during this period he used the airplane for personal reasons. The Aerostar was also leased to other entities for brief periods during each of the years 1972 through 1977. Since expenses attributable to operation, housing, and maintenance of the airplane exceeded gross receipts, petitioners deducted the amounts of the resultant net losses on their Federal income tax returns for 1972 and 1973. [13]/ *554 Petitioners claim that they were engaged in aircraft leasing activities for profit and that losses attributable to such activities are thus deductible under section 162. Arguing that ownership and operation of the airplane is petitioner's hobby, respondent maintains that the Aerostar was leased only in order to defray a portion of related expenses and that expenses are, therefore, deductible only to the extent allowed under section 183. We agree with respondent.
Ordinary and necessary expenses attributable to an activity not engaged in for profit are deductible only to the extent of gross income derived from such activity less the amount of those deductions which are allowable whether or not the activity is engaged in for profit. Sec. 183(b); [14]/ sec. 1.183-1(b)(1), Income Tax Regs. An activity not engaged in for profit is defined in section 183(c) as one for which deductions under sections 162 and 212(1) and (2) are not allowable. *555 In deciding whether an activity is described in section 183, the focus is on the objective with which the taxpayer entered into and engaged in the activity. If the taxpayer had a bone fide, even though unreasonable, objective of making a profit, the activity is not described in section 183. Jasionwski v. Commissioner, 66 T.C. 312, 321 (1976); sec. 1.183-2(a), Income Tax Regs.; Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967). Accord Carkhuff v. Commissioner, 425 F.2d 1400, 1404 (6th Cir. 1970); Hirsch v. Commissioner, 315 F.2d 731, 736 (9th Cir. 1963). Rather an activity described in section 183 may be one "carried on primarily as a sport, hobby, or for recreation." Sec. 1.183-2(a), Income Tax Regs. The determination of the taxpayer's intent is to be based on "all of the facts and circumstances" with respect to the activity, with greater weight placed on objective facts than on the taxpayer's statement of intent. Sec. 1.183-2(a), Income Tax Regs. *556 Churchman v. Commissioner, 68 T.C. 696, 701 (1977); Benz v. Commissioner, 63 T.C. 375, 382-384 (1974). Nine factors which are normally taken into account are listed in the regulation. See sec. 1.183-2(b), Income Tax Regs. Our decision in the instant case is founded upon a combination of several of these factors. These include consistent and sizeable losses, substantial income from other sources, the recreational aspect of ownership and operation of the aircraft, the limited time and effort devoted by petitioners to the activity, and commencement and continuation of aircraft leasing in a manner which does not reflect business expertise. From 1972 through 1977, expenses from the aircraft leasing operation far exceeded gross receipts, resulting in a net loss for each year. The amounts of these net losses ranged from $12,958 in 1977 to $26,347.64 in 1973. When expenses, which ranged from $23,870 in 1976 to $36,946.22 in 1973, are compared with gross receipts only from sources other than the Worley Corporation and petitioners' *557 personal use, the unprofitability of the aircraft leasing activities is yet more striking. Indeed, the ratio of average annual expenses to average annual gross receipts is between 3-to-1 and 4-to-1. Such an imbalance belies the existence of a profit motive. Jasionowski v. Commissioner, supra at 322. The record discloses no basis for concluding that a period of 6 years is customarily necessary to bring an aircraft leasing operation to profitable status. Hence, the history of losses for the aircraft leasing activity is a factor which may be indicative of an activity not engaged in for profit. Sec. 1.183.2(b)(6), Income Tax Regs.Bessenyey v. Commissioner, 45 T.C. at 275. From 1972 through 1977, income from other sources, primarily derived from petitioner's medical practice, ranged from $83,391.94 in 1974 to $114,763 in 1976. As the amounts of deficiencies for 1972 and 1973, $18,271.19 and $13,386.21, respectively, illustrate, petitioners partially recouped losses from the aircraft leasing operation by offsetting those losses against their other *558 income and thus reducing their tax liability. The combination of losses from the activity at issue and substantial income from other sources may be an indication that the activity is not engaged in for profit, particularly if the activity is one viewed by the taxpayer as recreational. Sec. 1.183-2(b)(8), Income Tax Regs.Jasionowski v. Commissioner, supra at 322; Johnson v. Commissioner, 59 T.C. 791, 817 (1973), affd. on another issue 495 F.2d 1079 (6th Cir. 1974), cert. denied 419 U.S. 1040 (1974). In fact, petitioner maintained a long-standing personal interest in aviation. An amateur pilot, a member of the Flying Physicians, and a subscriber to aviation literature, he owned two other planes before buying the Aerostar. During the years 1972 through 1977, he used the Aerostar in part for personal pleasure. Petitioners' installation of the stereo system is consistent with use of the airplane for a hobby. Accord Carkhuff v. Commissioner, supra at 1405. The enjoyment petitioner *559 obtained from ownership of the airplane supports our conclusion. Sec. 1.183-2(b)(9), Income Tax Regs.; Benz v. Commissioner, supra at 385; compare Allen v. Commissioner, 72 T.C. 28, 36 (1979). A fourth factor is the minimal time and effort expended by petitioners on the aircraft leasing activities. Sec. 1.183-2 (b)(3), Income Tax Regs. Compare Churchman v. Commissioner, supra at 702-703. Petitioners do not contend that Constance devoted any time whatsoever to the Worley Air Lease Co., and there is no evidence of her active involvement. According to the record, much of the time petitioner spent on activities related to the Aerostar was devoted to piloting the aircraft for his personal use or for the Worley Corporation rather than to obtaining leases. Indeed, petitioner himself testified that he devoted much less time to the aircraft leasing activities than to his medical practice. Furthermore, the manner in which petitioners entered into the activity does not reflect any reliance on expertise. The record does not indicate that he was an expert on aircraft, much *560 less on the type of aircraft used in the aircraft leasing business. Although petitioner testified that one or two commercial pilots told him that the Aerostar was a fast, well-designed aircraft, he neither called the pilots as witnesses nor even identified them by name. The record does not support petitioners' claim that he obtained guarantees of 620 hours of flight time per year when he purchased the Aerostar. To document the alleged guarantees, petitioner introduced in evidence only an unexecuted lease signed by petitioner but not by Miller, with a 120-hour guarantee added in handwriting, and the invoice submitted to Runway with a handwritten note signed "W. Miller." The note is consistent with a finding that no guarantee ever existed. We cannot find that petitioners started the activity with any reasonably expected source of income other than that from entities they controlled. The record reveals no more definite knowledge of anticipated expenses. Although petitioner testified that he consulted the manufacturer's projection of expenses, this projection was not introduced in evidence and petitioner was unable to recall the amounts of individual or total expenses. According *561 to petitioner, his accountants thoroughly reviewed the aircraft leasing operation and recommended it as "a good business venture." However, his accountant, Sheppard, who appeared as petitioners' witness, stated that the accountants merely discussed the planned venture based on information petitioner provided, in Sheppard's words, "for the purpose that if the bank had asked us to prepare a projection [in connection with the loan application], we would have had the material to do so." Considering these factors, we cannot conclude that petitioners prepared for the activity by extensive study of its accepted business practices, within the meaning of section 1.183-2(b)(2), Income Tax Regs.
Neither does the evidence indicate that the aircraft leasing operation was managed in a businesslike manner. Although maintaining a separate bank account and separate records for the activity and filing a fictitious name statement are consistent with an intent to operate a business, such factors do not in and of themselves outweigh contrary indications. Sec. 1.183-2(b)(1), Income Tax Regs. *562 The North Carolina mailing address, listed second on petitioners' stationery, was purportedly established to facilitate leasing of the Aerostar to Bledsoe's North Carolina company or to take advantage of lower State taxes. Yet the record does not show that the Worley Air Lease Co. was in fact a North Carolina company or how the use of the address advanced either of the stated goals. According to petitioners, the method of taking title to the airplane and the use of legal counsel to draft purchase and lease agreements indicate that the activity was operated like a business. Use of legal counsel to draft the purchase and lease agreements is consistent with the purchase of an expensive item for personal use. As Sheppard testified, the accountants recommended taking title in the names of petitioners rather than in that of the Worley Corporation to avoid involving the Worley Corporation in a violation of the State professional corporation law statutes. In our view, the charges to the Worley Corporation were not set in a businesslike manner. Petitioner testified that he relied on his accountants to set charges. Petitioners' accountant, Gorr, who stated that he set rates in accordance *563 with information obtained from those in the air transport industry, testified that he was not told of guaranteed minimums when he established the rates. Yet petitioner's testimony with respect to the alleged guarantees indicates an awareness of the air industry practice of billing minimum guaranteed hours for periods of extended usage. Because the Worley Corporation was charged on a per mile basis, it sometimes paid relatively little for use of the aircraft over an extended period of time; an example is the charge of $285 for the July 3 to 10, 1974, Boston trip. In contrast, petitioner, like the air transport operators, was charged for personal use on the basis of flight hours. According to Gorr, the difference in charges is explained by the fact that petitioner supplied his own pilot when he leased the plane. However, so did the Worley Corporation. In fact, except for one occasion, the pilot supplied by petitioner and by the Worley Corporation was the very same individual, petitioner. Other factors similarly belie petitioners' claim that the activity constituted a business. The Worley Air Lease Co. maintained no office and no listing in any telephone directory. Advertising *564 and promotional expenses were limited. Petitioner tended to lease to those he or an acquaintance knew. The advantageous Conair Lease, which did not come into fruition, was not sought out by petitioner. Rather Foy approached petitioners simply as one of the known owners of Aerostars. Compare Churchman v. Commissioner, 68 T.C. at 702. Although petitioners make much of the insurance they maintained on the aircraft, "passenger carrying for hire use" coverage was carried only for the first 6 months. After the first year, the insurance no longer covered periods when the aircraft was leased to others or when it was flown by anyone other than petitioner. Petitioners installed an alternate air source in order that the airplane could qualify for an air taxi operation, but the aircraft was not certified for such use at least during the years in issue. In the face of sizeable losses and scanty revenues, petitioners did little to alter the operation of the activity, a factor inconsistent with a profit motive. Sec. 1.183-2(b)(1), Income Tax Regs. Compare Churchman v. Commissioner, supra at 702. It is noteworthy that the *565 Worley Corporation was billed in the very same manner until 1977, at which time the increased rate per mile charged for three trips constituted the only change. Petitioners note that they moved the aircraft from one hangar to another. However, such a change simply substituted one air transport operator for another, ensuring revenues only when the current operator succeeded in subleasing the airplane. The lessee was still limited by the need to obtain petitioners' consent to sublease and to make the aircraft available to petitioners during weekends or any time they intended to use the airplane. Carkhuff v. Commissioner, 425 F.2d at 1405; Johnson v. Commissioner, 59 T.C. at 7 815. As Sabol's testimony and the consistently low receipts suggest, the air transport operator had little incentive to promote sublease of the airplane in the absence of a guaranteed minimum, which was never negotiated. Moreover, petitioner never attempted to liquidate the operation or to follow Sabol's advice and run an air taxi operation. At trial, he explained his failure to start an air taxi operation as follows: I would have had to provide pilots. I would have had *566 to provide all of the accounterments that go with advertising and all the rest of it. Runway 5 had these in operation, they had the listings, they had the advertisements and so I didn't want to get up that far. I didn't want to compete. I would be competing with Runway 5. Thus he effectively confirmed what the pattern of operations implies, that he did not desire to conduct an air leasing business in competition with other air leasing businesses. As petitioners note, the expectation that profit will be obtained from the appreciation of assets held in connection with the activity is a factor which suggests that an activity is engaged in for profit. Sec. 1.183-2(b)(4), Income Tax Regs. Although petitioner stated at one point during trial that the Aerostar had appreciated by 1974, his testimony later indicated that the sole basis for such a statement was his unconformed belief. In connection with this argument, petitioners rely on Sanderson v. Commissioner, T.C. Memo. 1964-284, in which we suggested that unrealized appreciation of assets *567 might equal realized losses. In Sanderson, however, uncontradicted evidence showed that the value of land used in connection with a horse breeding operation had tripled by the time of trial. Also, the value of horses on hand was considerable. Petitioners further contend that the history of losses is not significant because it is attributable to unforeseen factors, such as the audit, the airplane's depressed value due to litigation with respect to its safety, the cancellation of the alleged guarantees and of the Conair lease, and the 1973 repairs to the airplane. Sec. 1.183-2(b)(6), Income Tax Regs. We are not convinced. We have noted there is no causal link between the audit and the losses. Nor have petitioners established that the market for Aerostars was, in fact, depressed or that the guarantees existed. Since the Conair lease, which related only to one year, was unsolicited, we do not think its cancellation is an unforeseen factor, within the meaning of the regulation. Indeed, only the repairs, which affected leasing of the airplane for only a few months, constitute a circumstance similar to those mentioned in the regulation.
Challenging *568 reliance on the personal pleasure derived from ownership of the airplane, petitioners remind us that this Court has stated "suffering has never been made a prerequisite to deductibility." Jackson v. Commissioner, 59 T.C. 312, 317 (1972). According to petitioners, their personal use of the aircraft during the years in issue was minimal as was that of the taxpayer in Jackson. Judging by the amounts billed petitioners during each of the years in issue, however, their personal use constituted a substantial portion of all use of the aircraft. 2. Investment Credit
In 1972, petitioners claimed an investment credit in the amount of $6,074.72. the parties agree that our disposition of the first issue controls this issue. Accordingly, we sustain the Commissioner's disallowance of the investment credit. Section 38 allows a tax credit for investment in certain property; the amount of the credit is determined under sections 46 through 50. See sec. 46(a)(1)(B), (a)(2), and (c). The credit is available for "tangible personal property." Sec. 48(a)(1)(A). However, such *569 property, like all section 38 property, must be that "with respect to which depreciation * * * is allowable." Sec. 48(a)(1). Depreciation is allowable only for property "used in the trade or business," or "held for the production of income." Sec. 167(a). Since the Aerostar was held in connection with an activity not engaged in for profit, it is not an item with respect to which depreciation is allowable. Hence the airplane does not qualify as property for which the investment credit may be claimed. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.
2. /↩ An air taxi operation directly leases aircraft to the public for transportation. The Federal Avilation Agency sets specified requirements for airplanes to be used in such an operation.
3. /↩ A guaranteed minimum is commonly charged by air transportation operators, particularly for a lessee who leases an aircraft for a period of time during which he may log relatively little flight time.
4. / The dates on which the airplane was leased to the Worley Corporation, the destination and mileage of each flight, and total charges are as follows: ↩
Total From
To
Destination
Miles
Charge
4/12/72
4/23/72
Flying Physicians
5,547
$4,160
meeting--South
Carolina, Martinque
and Puerto Rico
8/27/72
9/1/72
Flying Physicians
1,301
976
meeting--Pine
Mountain, Ga.
10/10/72
10/10/72
Robert Ivy Society
320
240
meeting--Lancaster,
Pa.
$5,376
5. / The dates on which the airplane was leased to the Worley Corporation, the destination and mileage of each flight, and total charges are as follows: ↩
Total From
To
Destination
Miles
Charge
3/23/73
4/14/73
Flying Physicians
5,459
$4,094.25
meeting--Mexico &
Florida
Morgantown, W. Va.
107
80.25
7/13/73
8/5/73
Flying Physicians
4,192
3,144.00
meeting-Southwest
United States
10/21/73
10/26/73
American Socity
1,875
1,406.25
of Plastic and
Reconstructive
Surgeons--Hollywood,
Fla.
$8,724.75
6. / The dates on which the airplane was leased to the Worley Corporation, the destination and mileage of each flight, and total charges are as follows: ↩
Total From
To
Destination
Miles
Charge
3/4/74
3/8/74
Daytona Beach,
1,600
$1,200.00
Fla.
4/4/74
4/4/74
Hilton Head, S.C.
920
690.00
5/25/74
5/27/74
Sarasota, Fla.
850
637.50
6/11/74
6/11/74
Philadelphia, Pa.
460
345.00
7/3/74
7/10/74
Boston, Mass.
380
285.00
8/18/74
8/25/74
Macinac, Mich.
856
642.00
9/22/74
9/27/74
Biloxi, Miss.
1,660
1,245.00
10/26/74
10/30/74
Houston, Tex.
1,907
1,430.25
$6,474.75
7. / The dates on which the airplane was leased to the Worley Corporation, the destination and mileage of each flight, and total charges were as follows: ↩
Total From
To
Destination
Miles
Charge
3/15/75
3/18/75
Florida
1,714
$1,285.50
5/18/75
5/21/75
Watertown, N.Y.
800
600.00
5/24/75
5/27/75
Jeckyl Island, Ga.
600
450.00
7/16/75
8/4/75
Halifax, Nova
2,415
1,811.25
Scotia
9/30/75
10/2/75
Boston, Mass.
451
338.25
$4,485.00
8. / The dates, flight times, and total charges are as follows: ↩ Month
Flight Time
Total Charge
May
14.023 hrs.
$ 701.15
June
14.716 hrs.
735.80
July
21.78 hrs.
1,089.00
August
20.985 hrs.
1,049.25
September
3.6 hrs.
180.00
$3,755.20
9. / The dates on which the airplane was leased to the Worley Corporation, the destination and mileage of each flight, and total charges were as follows: ↩
Total From
To
Destination
Miles
Charge
4/16/76
4/18/76
Daytona Beach, Fla.
1,606
$1,204.50
5/12/76
5/12/76
Cincinnati, Ohio
465
348.75
7/22/76
7/30/76
Toronto, Canada
1,067
800.25
9/25/76
9/30/76
Philadelphia, Pa.
1,485
1,113.75
and Boston, Mass.
$3,467.25
10. /↩ Under a dry lease, the lessee supplies fuel and oil. 11. At trial, petitioner testified that he had obtained this guarantee on the day of purchase from a Mr. Bledsoe, whom petitioner understood to be a salesman and executive of an unidentified North Carolina clothing manufacturer as well as an aircraft salesman for Runway. Neither seeing nor hearing from Bledsoe after this meeting, petitioner became aware, according to his testimony, that this guarantee would not be honored.↩
12. / The dates on which the airplane was leased to the Worley Corporation, the destination and mileage of each flight, and total charges were as follows: Total From
To
Destination
Miles
Charge
2/ 2/77
2/ 5/77
Miami, Fla.
1,800
$1,350.00
The rate for the Jeckyl Island trip was 90 cents per mile and that for the Hershey and Daytona Beach trips was 95 cents per mile.
[1]↩3/31/77
3/31/77
Hershey, Pa.
226
214.70
[1]4/ 8/77
4/11/77
Daytona Beach, Fla.
1,606
1,525.70
[1]5/22/77
5/31/77
Jeckyl Island, Ga.
1,140
1,026.00
7/ 7/77
7/27/77
Bahamas, Sarasota,
3,460
2,595.00
Dallas, Santa Fe,
Cedar City, Jackson
Hole, Sun Valley,
Dallas, Albuquerque,
and St. Louis
9/24/77
9/24/77
Wilmington, Del.
442
331.50
11/ 8/77
11/10/77
Durham, N.C.
850
637.50
$7,680.40
13. / According to petitioners, the Internal Revenue Service audit of petitioners' Federal income tax returns for 1972 and 1973, which began in 1974 and continued until the latter part of 1977, caused petitioners such uncertainty that they were unable to effect any changes in their method of operations during the period of the audit. Petitioners argue that evidence of their conduct of the aircraft leasing operation during 1975, 1976, and 1977 is irrelevant to the issue before us because the audit constitutes an unforeseen or fortuitous circumstance beyond the control of the taxpayer, within the meaning of sec. 1.183-2(b)(6), Income Tax Regs.
It is, however, well settled that evidence of the conduct of an activity during subsequent years is relevant to a determination whether a taxpayer had a profit-making intent during the year at issue. Abrams v. United States, 449 F.2d 662, 663 (2d Cir. 1971); Bessenyey v. Commissioner, 379 F.2d 252, 254 (2d Cir. 1967), affg. 45 T.C. 261 (1965), cert. denied 389 U.S. 931 (1967); Schley v. Commissioner, 375 F.2d 747, 749↩ (2d Cir. 1967). If existence of the audit impeded any plans for change, this Court would bear that fact in mind when evaluating the evidence. However, petitioners presented no evidence of specific plans which were affected by the audit.
14. /SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (b) Deductions Allowable.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).↩