THOMAS W. JACKSON, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6193–69. Filed November 27, 1972.

*Elliott Manning*, for the petitioner.
*Michael A. Menillo*, for the respondent.

STERRETT, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax and an addition to tax in the following amounts:

| Year | Deficiency | Addition to tax under sec. 6653(a)[1] |
|---|---|---|
| 1966 | $6,608.58 | $330.43 |

At issue in this case is the deductibility of expenses and depreciation, pursuant to sections 162(a) and 167(a), respectively, incurred by the petitioner in the operation of the yacht *Thane* during 1966. Further we must also determine whether any portion of the asserted deficiency is due to negligence or intentional disregard of the rules and regulations.

#### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this reference.

Petitioner Thomas W. Jackson is an unmarried individual residing at the time of the filing of his petition herein at New York, N.Y. Petitioner filed his individual income tax return for the calendar year 1966 with the district director of internal revenue at New York, N.Y.

During 1966, the year in question, petitioner was president of National Manpower Register, Inc., and a vice president of Careers, Inc. Petitioner was also a stockholder in these corporations and received a salary of approximately $25,000. His other income was negligible.

---

[1] All statutory references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.

Petitioner purchased the yacht *Thane* in late 1958 at a cost of $7,000. *Thane*, a 65-foot ketch built in 1911, was in poor condition after having been moored at dockside with little attention for several years.

Petitioner's salary at the time he purchased *Thane* was $9,000 per year. With very limited funds, petitioner and his brother, Peter Jackson (hereinafter referred to as Peter), set out to refurbish the boat. By 1961 they had made extensive repairs and improvements including rebuilding and recaulking the hull and deck, purchasing new sails, adding new equipment, and replacing old.

Between 1961 and 1963 petitioner fully investigated the idea of chartering *Thane*. *Thane* was able to accommodate six passengers quite comfortably plus a crew of three. Letters from various charter brokers indicated a need for sailing boats of *Thane's* size throughout the Caribbean, especially in the Virgin Islands. However, mechanical and financial problems prevented petitioner from bringing *Thane* to the Virgin Islands during this period.

By 1964, petitioner had increased his outside earnings and was able to borrow an additional $10,000, which provided the funds necessary to get started in the chartering business. Peter, who had received extensive sailing experience on the *Thane*, served as captain. Petitioner himself had no more than 20 hours of time sailing a boat prior to the purchase of the *Thane*. His principal occupation kept him in New York City, although he occasionally served as a crew member. With this arrangement petitioner and Peter were to share any profits equally, and Peter would receive living expenses for both him and his wife Constance. Constance also served as a member of the crew, most often as cook.

Petitioner had an elaborate brochure prepared which described *Thane's* accommodations and desirability as a charter. Moreover, *Thane* was advertised in magazines, such as Yachting, and was listed with travel agencies and charter brokers At that time there were numerous other boats similar to *Thane* operating as charters in the Virgin Islands.

*Thane's* charter rates ranged from approximately $1,000 to $1,500 per week, including food, depending on the number of passengers. Petitioner expected to be able to charter *Thane* at least 30 weeks during the charter season. *Thane's* charter rates and expected use were not unusual for boats of *Thane's* size in the Virgin Islands.

Significantly, in the latter part of 1964 petitioner was able to sign a charter agreement with well-known television personality Hugh Downs (hereinafter referred to as Downs) for a fee of $18,000 plus costs. The actual charter did not commence until July 1965. However, with the publicity of this forthcoming charter and other advertising, *Thane* was chartered to several parties between February and April of 1965,

producing revenues of approximately $4,000. *Thane* was then brought to Florida from the Virgin Islands in preparation for the Downs charter.

The Downs charter left for Tahiti in the South Pacific on June 30, 1965. Besides providing immediate capital from a large downpayment, petitioner received extensive publicity for *Thane*, especially on the nationally televised "Today Show" hosted by Downs. The cruise ended in September of 1965, when Downs departed in Tahiti.

On return from Tahiti, a Paramount film crew was on board, producing a film for television and a movie short entitled "Voyage from Tahiti." This was done as a publicity stunt for *Thane*. By the end of 1965 *Thane* had earned $30,000 in gross revenues, and made a small profit.

The original plans called for *Thane* to return by January 1966 to the Virgin Islands for the 1966 charter season. Several advance charters were booked and others were in the process of negotiation.

The return voyage from Tahiti was delayed by weather and other problems. *Thane* did not reach Panama until mid-January. As a result of this delay, the advanced bookings were canceled and brokers were notified to discontinue chartering *Thane*.

In Panama petitioner had to relieve the entire crew, including Peter, due to exhaustion from the long and tiring journey. A new captain and crew attempted to bring *Thane* to the Virgin Islands for part of the charter season. Several attempts met with strong winds, rough seas, and resultant severe damage to the boat.

By March petitioner decided to forego the 1966 charter season in the Virgin Islands and return *Thane* to Florida for repairs. Peter and Constance were returned to *Thane* in Florida, and approximately 3 months were then devoted to repairs.

Having lost the normal charter season, petitioner was advised by charter brokers that *Thane* could be chartered in the Long Island Sound area. *Thane* was brought to Essex, Conn., where two charters were secured. *Thane* was returned to the Virgin Islands in October in preparation for the 1967 charter season. *Thane* was chartered after 1966, but the record does not indicate the revenues or expenses.

During 1966 petitioner's personal use of *Thane* was limited to assisting in serving as a member of the crew on the trip from Florida to Connecticut and on a charter.

Petitioner used the cash method of accounting. A formal system of bookkeeping was not maintained by petitioner for *Thane*. However, a vast number of canceled checks, receipts, stubs, and notations were presented periodically to his accountant. The chartering of *Thane* produced $2,250 in gross revenues for the calendar year 1966. At trial,

petitioner was able to substantiate the following 1966 expenditures in connection with the *Thane:*

| | |
|---|---:|
| Crew costs | $2, 721. 08 |
| Repairs, maintenance, dockage | 1, 695. 29 |
| Advertising | 240. 00 |
| Travel Expense | 450. 00 |
| Miscellaneous | 108. 53 |
| Yacht insurance | 1, 319. 30 |
| Airline charges | 882. 78 |
| Telephone | 393. 36 |
| Interest | 526. 62 |
| Charter commissions | 270. 00 |
| | 8, 606. 96 |

*Amounts paid directly to Thane captains during 1966*

| | |
|---|---:|
| Paul Johnson | $1, 800. 00 |
| Peter Jackson | 7, 100. 00 |
| Robert Kellogg | 150. 00 |
| Transfer charge | 54. 45 |
| | 9, 104. 45 |
| Total | 17, 711. 41 |

Petitioner's arrangement with each person who served as captain was to deliver funds to the captain for operating expenses of *Thane*, with that person making the expenditures and accounting later to petitioner.

Petitioner claimed total cash expenses of $18,460.73 and depreciation in the amount of $2,044.68. Depreciation was based on the following capital expenditures:

| Property | Year | Amount |
|---|---|---:|
| 65-foot auxiliary ketch | 1958 | $7, 000. 00 |
| Improvements | 1959–60 | 5, 000. 00 |
| Improvements | 1961–64 | 7, 403. 10 |
| Freezer, generator, and other improvements | 1965 | 8, 804. 59 |
| | | 28, 207. 69 |

OPINION

The first issue for consideration is whether chartering of the yacht *Thane* constituted a trade or business thereby permitting the deduction of all ordinary and necessary expenses pursuant to section 162(a)[2] and depreciation under section 167(a)(1).[3]

---

[2] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

(1) a reasonable allowance for salaries or other compensation for personal services actually rendered;

[3] SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or

In order to constitute a trade or business, it is necessary that the operation be conducted for the purpose of making a profit. *Lamont* v. *Commissioner*, 339 F. 2d 377 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court. The intention of the taxpayer is a question of fact to be determined from all the evidence. Further, the expectation of profit need not be reasonable, only genuine. *Margit Sigray Bessenyey*, 45 T.C. 261 (1965), affd. 379 F. 2d 252 (C.A. 2, 1967).

After a thorough analysis of the evidence in the instant case, we are convinced that petitioner chartered *Thane* with the intention of making a profit.

The chartering of boats, particularly throughout the Caribbean, is a common business enterprise. As early as 1961, petitioner began to investigate the business potential of *Thane*. After recognizing the market for chartering *Thane*, we think petitioner engaged in sound and reasonable efforts to enter this business. He transformed *Thane* into a luxurious and commodious sailing vessel and brought her to the Virgin Islands where she was in great demand. He also staged a thorough advertising campaign including preparing and mailing an elaborate brochure, and contacting numerous charter brokers and travel agents. Indeed, many of these efforts were successful. Not only was he able to attract a significant number of private charters, but he was also able to secure an extended charter with television personality Hugh Downs, which provided both revenue and national publicity for *Thane*.

For the calendar year 1965, *Thane* earned $30,000 in gross revenues and made a small profit. Were it not for the vicissitudes of any business dealing with the sea, specifically sea and weather conditions which can limit operations and damage property, *Thane* may have been profitable during 1966. It is clear that because of *Thane's* delay in returning from Tahiti, a number of charters had to be canceled and she was removed from further consideration by brokers for the 1966 charter season.

Petitioner did not maintain a formal set of books for *Thane's* business. However, it was petitioner's practice to require the captain of *Thane* to account for any sums expended. Moreover, petitioner kept these records, along with canceled checks, stubs, and other notations, and periodically turned them over to his accountant for preparation of *Thane's* financial record. Though perhaps not the most efficient method of business accounting, it was adequate and does not indicate any lack of profit motive.

Unlike *Ernest H. Martin*, 50 T.C. 341 (1968), and *Marcell N. Rand*, 34 T.C. 1146 (1960), the entire record indicates that petitioner's personal use of the yacht was quite limited, especially in 1966. Petitioner's

principal place of business was New York City. *Thane* on the other-hand was either en route from Tahiti, in Florida, or the Virgin Islands. Only once during petitioner's ownership of *Thane* was the boat in nearby Essex, Conn., which we feel was the result of an honest attempt to salvage part of the charter season lost by earlier ill fortune.

We are impressed by petitioner's relatively modest income. Clearly, the tax incentive for incurring large expenditures in a hobby-type business are much greater for one who has a great deal of income from other sources. Furthermore, if petitioner was interested primarily in tax benefits, we are unable to perceive any benefit derived from securing loans to provide additional working capital.

We also note that a business will not be turned into a hobby merely because the owner finds it pleasurable; suffering has never been made a prerequisite to deductibility. "Success in business is largely obtained by pleasurable interest therein." *Wilson* v. *Eisner*, 282 F. 38, 42 (C.A. 2, 1922).

Lastly, respondent argues that a major purpose served by *Thane* was to provide an occupation for Peter and Constance, petitioner's brother and sister-in-law. This is pure conjecture by respondent and, under any circumstances, we fail to see the connection between providing employment for a relative and the profit motive. Many businesses are able to serve both purposes quite well.

For these reasons we feel petitioner has sustained his burden of proving that he was in the business of chartering *Thane*.

Having held that the operation of petitioner's yacht constituted a trade or business, he has the burden of substantiating that the claimed expenses were actually incurred and that they were ordinary and necessary. *Welch* v. *Helvering*, 290 U.S. 111 (1933).

Petitioner was able to substantiate at trial $17,711.41 of the $18,460.73 claimed as expense deductions on his 1966 income tax return. This was done by a conglomeration of canceled checks, receipts, stubs, notations, and petitioner's testimony. Respondent has questioned whether many of petitioner's expenses were ordinary and necessary. He has focused to a great extent on a number of living expenses of Peter and Constance, such as auto repairs and insurance, liquor, and sums given to Peter when not in charge of *Thane*. Further, he has questioned the deductibility of amounts forwarded directly to the various captains of *Thane* for operating expenses.

Regarding the payment of Peter's living expenses, it is true that payments to relatives must be closely scrutinized. See *Cecil Randolph Hundley, Jr.*, 48 T.C. 339 (1967). Petitioner and Peter were parties to an oral agreement specifying that in exchange for Peter's services

as captain, petitioner and Peter would divide any profits and that petitioner would provide living expenses for Peter and Constance. In light of the services provided and the uncontested profitability of *Thane*, we find this to be quite reasonable. There is every indication that Peter possessed the skills necessary for this type of employment. Furthermore, since Peter was *Thane's* regular captain, serving in that capacity in all but a few instances, we find that payments to Peter while not on board were appropriate. Accordingly, we find that petitioner's deductions for Peter's living expenses are properly deductible as compensation.

Petitioner sent sums of money to the various captains of *Thane* during 1966 and required them to account for its use. The detail and reliability of accounting to petitioner varied with each captain. Nevertheless, all were able to show that a large portion of the money was spent on operating expenses. The remainder, which was not properly accounted for according to respondent, could be classified as either operating expenses or additional compensation. As to either, we feel petitioner has demonstrated the reasonableness of these payments. Therefore, petitioner is entitled to deduct $17,711.41 as ordinary and necessary business expenses within the meaning of section 162(a).

Petitioner claimed depreciation of $2,044.68 for 1966. Through petitioner's credible testimony, photographs, and canceled checks concerning the purchase price and capital improvements of *Thane*, we are convinced that $2,044.68 is a reasonable allowance for depreciation within the purview of section 167(a)(1).

Respondent imposed the negligence penalty of section 6653(a)[4] in the instant case, based primarily on petitioner's recordkeeping. *Joseph Marcello, Jr.*, 43 T.C. 168 (1964), cited by respondent stands for the proposition that failure to maintain any records of expenses constitutes negligence. Petitioner did not maintain a formal set of books for *Thane*, but he did keep a record of his expenses as indicated by the numerous exhibits in this case. We therefore think the imposition of the negligence penalty of section 6653(a) was erroneous.

*Decision will be entered under Rule 50.*

---

[4] SEC. 6653. FAILURE TO PAY TAX.

(a) NEGLIGENCE OR INTENTIONAL DISREGARD OF RULES AND REGULATIONS WITH RESPECT TO INCOME OR GIFT TAXES.—If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.