PATRICK EDWARD McLARNEY and KATHRYN COLVER McLARNEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McLarney v. Commissioner
Docket Nos. 4196-80, 11506-81.
United States Tax Court
T.C. Memo 1982-461; 1982 Tax Ct. Memo LEXIS 282; 44 T.C.M. (CCH) 752; T.C.M. (RIA) 82461; August 9, 1982. *282 Held, the deductibility of 1977 and 1978 losses from taxpayers' activities in connection with the charter boat "Hippocanudius" are not limited by sections 183 and 280A, I.R.C. 1954. Patrick Edward McLarney, pro se. Antonio R. Espinosa, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined the following deficiencies in petitioners' federal income tax: Docket No.
Tax Year
Deficiency
4196-80
1977
$2,411
11506-81
1978
2,818
After a concession by respondent the issue for our decision is whether sections 280A and 183[1] limit the deductibility of losses from petitioners' boat chartering activity in 1977 and 1978. FINDINGS OF FACT Some of the facts of these consolidated cases are stipulated. The stipulation and its attached exhibits are incorporated herein by reference. Petitioners resided in Bound Brook, New Jersey, when they filed the petitions in these cases. Petitioners resided in Redmond, Washington, during 1977. From January 1, 1977, to January *283 5, 1978, petitioner Patrick McLarney worked full-time for Pacific North West Bell Telephone Company. During this period petitioner Kathryn McLarney worked full-time as a nurse for the Children Orthopedic Medical Center in the Seattle area. On January 6, 1978, Mr. McLarney was transferred to New Jersey to work for 3-1/2 years for his employer's parent company, American Telephone and Telegraph. Mrs. McLarney accompanied her husband during the transfer. She was unemployed during their stay in New Jersey. In 1976 petitioners considered several investment activities. Petitioners wanted to actively manage a business rather than make a passive investment in a savings account or securities. They examined residential property in Bellevue which is east of Seattle. They were interested in Bellevue Because it was, In their opinion, a primary growth community in the Seattle area. They decided against this investment because they lacked sufficient capital for the down payments required on the properties. They also examined recreational properties along Discovery Bay, Hood's Canal and waterfront land on Bainbridge Island. They decided against these investments because they thought that *284 these properties were too far from where they lived to maintain security, to manage the property and to meet and escort prospective clients. They also looked at ski locations in the Cascade Range. Principally they investigated the Snoqualmie Pass area which is a major ski resort between Mt. Ranier and Mt. Baker. Like the waterfront properties, the ski locations were too far away for petitioners to maintain active surveillance and management of the properties. Also, petitioners were concerned that the limited length of the ski season hurt their chances of recouping their investment and earning a return on their capital. Petitioners also investigated aircraft ownership and rentals. They decided that it was not a good business for them based on the experience of family members who previously had owned aircraft. Petitioners decided to buy a charter boat. Boat chartering was a big business in Seattle because of the extensive network of waterways in the area and the mild climate. Also petitioners favored this activity because it would be performed in the Seattle area close to their home. Thus they could effectively manage the activity while maintaining their work schedule. In addition, *285 petitioners could enter the chartering business with a lower cash down payment than the amount required for the other investments they examined. Petitioners enjoyed boating. They had been boating with family and friends several times before 1976. Also, they chartered a boat for one week during 1975 for their personal pleasure. Before purchasing a charter boat petitioners talked to Mrs. Marty Ledger who was the surviving partner of Ledger Marine Charters. Mrs. Ledger's company had been in business since 1947. It was located on Lake Union, which is the center of the Seattle boat chartering business. Petitioners asked Mrs. Ledger: "What does it take? You are in the business. You have been there. What can you tell us about what are the things to be done to make it most successful?" From discussions with Mrs. Ledger petitioners developed a set of criteria to apply in selecting a charter boat. The most important consideration was size. Mrs. Ledger recommended a twin engine vessel between 30 and 35 feet long or any vessel over 50 feet long. A 30 to 35 foot boat usually has 6 berths. Thus it offers good profit potential in attracting one or two families for a several-day trip. *286 A larger boat can berth more people. But a larger boat is harder to handle than a 30-35 foot boat. This skill level factor limits the size of the charter market for boats exceeding 35 feet. Also, the greater difficulty of handling a larger boat means that a 30-35 foot boat owner's risk of damage to the vessel while on charter is less than a larger boat owner's risk. A boat exceeding 50 feet in length reaches a different segment of the charter market. Five or six families could charter a vessel of this size. Together, they could afford to hire a professional captain to operate the boat. This type of very large boat could be used for extended trips, such as a several-week excursion up the coast from Seattle to Alaska. Age of the boat, Mrs. Ledger told petitioners, was not so important as size and features. The important consideration was to be in "charter-ready" condition when a prospective client saw the boat. The factor which impresses clients is a clean boat which starts as soon as the key goes in the ignition and which handles well when taken from the pier for a demonstration ride. The location of the pier where the boat is moored is very important. A boat located where clients *287 can see it, where they have easy access to it and from which they can easily get to good boating areas will be chartered much more easily than a boat without these advantages. Also, a covered mooring is important in the rainy Seattle climate to maintain the vessel in good operating condition. Another important consideration in purchasing a boat is the time elapsed from the prior engine overhaul. Engines must be overhauled after each 2,000 hours of use. Consequently, it is to the buyer's advantage to buy a boat which recently has had its engines overhauled. Among the boats available for sale in 1976 petitioners found three boats which appeared adequate for their planned chartering activity. These boats varied in price, length, age, moorage facilities and time elapsed from overhaul. After carefully considering each of the foregoing factors, petitioners on July 2, 1976, purchased the boat "Hippocanudius," which boat they thought offered the best chance for financial success. They purchased the boat from Robert Gorgen. Ledger Marine Charters acted as sales agent. The Hippocanudius was a 32-foot Tolly Craft Sport Crusier. It berthed six. It had a covered moorage in a prime spot *288 on the ship canal linking Lake Union and Puget Sound. The boat was an older model, 1964, which had a wood hull. Thus, petitioners were able to buy it for the relatively low price of $18,550. Also, petitioners figured that, due to its age, the boat's market price had depreciated to the lowest level it would attain. The boat was in good condition. Its engines had been overhauled only 500 hours previously. Thus the boat had another 1,500 hours before the next required engine overhaul. Before purchasing the boat petitioners estimated its operating costs and calculated the break-even level of operations at which they would begin to make a profit. Mrs. Ledger told petitioners that this boat would generate a gross rental of $500 a week. After a 25 percent charter broker fee petitioners would get a net rental of $375 for each week chartered. Using this estimate petitioners calculated that they would break even with 8.3 weeks of charters per year. Petitioners decided that the risk of not attaining this level of activity was small enough that they were willing to invest their money in purchasing this boat for charter. Petitioners did not include insurance payments or make an estimate *289 of repair costs in their break-even calculation. Petitioners placed the boat up for charter immediately after purchase. Petitioners entered an exclusive lease agreement with Ledger Marine Charters ("LMC"). This agreement provided that LMC would find charters for petitioners' boat. The agreement also provided that petitioners could not themselves, or through another agent, arrange additional charters. The advantage of this arrangement for petitioners was that their boat would be included in LMC's advertising and included as an integral part of LMC's large scale chartering operation. The boat petitioners purchased previously had been featured in some of LMC's promotional materials. On the basis of these factors and discussions with LMC, petitioners decided to operate in 1976 through the LMC exclusive lease agreement. LMC obtained only two charters - both for one week - for petitioners' boat during 1976. Petitioners were dissatisfied with this performance by LMC. Consequently, petitioners decided not to renew the exclusive lease arrangement for 1977. Instead, petitioners listed the boat with LMC and with Normandy Northwest, another marine chartering company, on a nonexclusive *290 basis. LMC and Normandy Northwest advertised petitioners' boat for charters and referred potential customers to petitioners. LMC received a 25 percent commission for referrals. Normandy Northwest received a 15 percent commission for referrals. In addition, Mr. McLarney tried to stimulate business through personal contacts and by advertising the boat in the telephone company's newsletter. The following chart summarizes the boat's use in 1977: Engine
Occasions
Days
Hours
Demonstration Ride
12
10
20.0
Charter
11
[2] 44
245.7
Post Charter Check
11
6
14.5
Service Check
14
14
23.3
Repair
2
2
2.5
Personal Use
7
7
20.0
Total
57
83
326.0
Petitioners chartered their boat 11 times in 1977. LMC's referrals provided six charters totaling 29 days and 150.5 engine hours. Normandy Northwest's referral provided one charter of two days and 10 engine hours. A sailboat firm in Takoma made a referral which provided one charter of three days and 15 engine hours. Petitioners' advertising efforts generated three charters totaling 10 days and 70 engine hours. The demonstration rides, the post-charter *291 checks, the repairs and the service checks were related to the chartering activity. Mr. McLarney provided demonstration rides for customers before a charter. The ride provided the customer a chance to assess the boat's characteristics and to learn how to operate it. The ride also gave Mr. McLarney a chance to evaluate the customer's capabilities. At the end of a demonstration ride Mr. McLarney required the customer to back the boat into its slip. This process tested a customer's capacity for handling the twin-engine craft. When the customer returned the boat from a charter Mr. McLarney performed a post-charter check of the boat. He examined the boat to see if anything was missing or broken. He also took the boat on a short run to see if it handled the way it did when he gave the demonstration ride before the charter. The repairs listed above consist of major repairs for which the boat was transported to a shipyard for work. The repairs arose from damage, including the loss of a propeller shaft and a rudder, which occurred during the charters. Mr. McLarney performed the service checks as part of the chartering operation to maintain the boat in charter-ready condition to attract *292 and satisfy customers. Mr. McLarney made the service checks at regular intervals when the boat was not used for charter or personal purposes. Mr. McLarney described the service check as follows: When you have twin engines sitting on the water, you have condensation that comes into the boat in the engine compartment and all these things will contribute to having that boat not function properly. The system check is going down on the boat and making sure it is clean, washing to off, cleaning out the windows, wiping condensation off the inside of the windows, going into the engine, making sure there haven't been any leaks or any of that sort of thing; checking to see that no water is going to enter through any of the ports, and then turning the engines on, letting them idle, and taking the boat out of the slip and taking it up into an appropriate area where you can put a load on the boat and drive the boat under power so you can check for a techometer that is missing, for problems with the ignition and things like that, which would cause the boat not to be usable, and then bringing it back and cleaning it up after you get done doing that, and covering it up and leaving it. Mr. McLarney, *293 with the help of a friend, performed all maintenance, except for major repairs, for the boat. Mr. McLarney spent a substantial amount of time in the chartering activity during 1977 by giving demonstration rides, post-charter checks, service checks and maintenance. The activity was a regular part of Mr. McLarney's schedule. He performed service checks every other week when the boat was not being used for chartering or personal purposes. Most of these checks were done on weekends, but Mr. McLarney was also available during the week and gave demonstration rides and performed post-charter checks to accomodate a customer's schedule. The personal use of the boat by petitioners in 1977 was recreational. Petitioners entered bare boat charters with their customers. Under this arrangement petitioners provided only the boat. The customers had to operate the boat or hire a captain. Neither petitioner applied for a commercial captain's license. Petitioners received $2,316.13 in rentals, net of commissions, from the chartering activity during 1977. Petitioners deducted the following boat chartering expenses for 1977: [3] *294 Interest
$1,281
Repairs
2,961
Insurance
633
Moorage
703
Automobile
555
Depreciation
2,181
Total
$8,314
Petitioners claimed a $5,998 loss with respect to the 1977 boat chartering activity. Respondent disallowed this loss in a deficiency notice dated February 13, 1980. In explaining the disallowance respondent in the deficiency notice, stated: Loss on chartered boat activity is disallowed under the provisions of Internal Revenue Code section 280A. Since the boat was rented for 15 or more days and it was used for personal purposes for the greater of (1) more than 14 days or (2) more than 10 percent of the number of days during the year for which it was rented, the deductions attributable to the property may not exceed the amount by which gross income derived from the rental activity exceeds the deductions otherwise allowable for the property. Accordingly, your taxable income is increased $5998.00. On January 6, 1978, Mr. McLarney was *295 transferred to New Jersey by his employer. Mrs. McLarney accompanied her husband to New Jersey. The opportunity to move to New Jersey arose late in 1977. Mr. McLarney interviewed for the new position in November, 1977. At the time petitioners purchased the boat in 1976 they expected to reside in the Seattle area permanently. The petitioners investigated the possibility of moving the boat to the East Coast. However, they were advised by professionals that their wood hulled boat probably would be extensively damaged in the 3,000 mile move. Accordingly, petitioners listed the boat for sale with Washington Yacht Sales ("WYS") in Seattle. Petitioners also asked WYS to list their boat for charter until a satisfactory sale was concluded. The boat was docked at WYS during 1978. Petitioners spent no time working on the boat during 1978. Although one demonstration ride was given in 1978, the boat was not chartered and petitioners received no rental income during the year. Petitioners made no personal use of the boat in 1978. On April 1, 1978, the boat became partially submerged while moored at WYS. The boat was raised, placed in dry dock and repaired within 12 hours. The boat *296 was available again for chartering on or about May 12, 1978. In April of 1978 petitioners hired an appraiser. He opined that the boat was worth $17,995. On or about September 7, 1978, petitioners sold the Hippocanudius for $13,230. Petitioners had to sell for less than the appraised amount because of submerging incident. Petitioners deducted the following boat chartering expenses in 1978: Interest
$ 988.63
Moorage
774.00
Miscellaneous
480.19
Depreciation
2,371.00
Total
$4,613.82
Petitioners claimed a $4,613.82 loss in 1978 from the boat chartering activity. Respondent disallowed this loss in a deficiency notice dated April 27, 1981. In explaining this disallowance respondent, in the deficiency notice, stated: "the rental loss applicable to the boat is disallowed as a section 183 loss." Petitioners maintained business records concerning the boat chartering activity. Petitioners maintained an engine log, an expense log and a revenue log. The records indicate every financial and mechanical activity conducted by petitioners concerning the boat. The 1977 engine log was substantially a contemporaneous record. The information appearing in the log was written on a scrap of paper at the time *297 of the event. The information was transferred to the log within two days to two weeks following the event. ULTIMATE FINDINGS OF FACT Petitioners' use of the Hippocanudius for personal purposes in 1977 did not exceed 14 days. Petitioners' boat chartering activity during 1977 and 1978 constitutes an activity engaged in for profit. OPINION The question for decision is whether sections 280A and 183 limit the deductibility of losses from petitioners' boat chartering activity in 1977 and 1978. Before we address the substantive issue we must consider a preliminary issue concerning the burden of proof. On the day of trial the Court granted respondent's motion for leave to file an amendment to his answer. The amendment included a determination that the disallowance of the 1977 loss also be based on the provisions of section 183. Petitioners were not surprised at trial by respondent's assertion of section 183 for 1977. Petitioners had discussed the application of section 183 to the 1977 loss in meetings held previously with respondent's counsel.
Generally, petitioners bear the burden of proof. Rule 142(a). However, the burden of proof is on the respondent for "any new matter… pleaded *298 in his answer." Rule 142(a). Petitioners bear the burden of proof for issues concerning tax year 1978 and for the section 280A issue for tax year 1977. However, a question arises concerning the burden of proof for the section 183 issue for 1977. A new position asserted by respondent in his answer is a "new matter" for Rule 142(a) purposes if it asserts a new issue. The burden of proof will not shift to respondent, however, if the new position merely makes the original determination more specific or provides additional reasons to support the original theory. Achiro v. Commissioner,77 T.C. 881, 889-891 (1981), and the cases cited therein. Respondent's assertion of section 183 as an alternative ground for sustaining the deficiency determination constitutes a "new matter." The Deficiency notice narrowly stated that the reason for disallowance was petitioners' alleged failure to satisfy the numerical limits in section 280A concerning personal use of the boat. Respondent's new position relies on a different Code section (section 183 instead of 280A) and a different type of test which analyzes different factors (motivation for carrying on the activity instead of the amount of personal *299 use of the boat). In these circumstances respondent's assertion of section 183 in his amended answer provides a new rationale relying on different factual bases. Accordingly, the amendment initiates a "new matter" within the meaning of Rule 142(a). Achiro v. Commissioner,supra.We hold, therefore, that respondent bears the burden of proof on the section 183 issue for tax year 1977. [4]
Tax Year 1977
Section 280A
Section 280A(a) provides: SEC. 280A. DISALLOWANCE OF CERTAIN EXPENSES IN CONNECTION WITH BUSINESS USE OF HOME, RENTAL OF VACATION HOMES, ETC. (a) GENERAL RULE.--Except as otherwise *300 provided in this section, in the case of a taxpayer who is an individual or an electing small business corporation, no deduction otherwise allowable under this chapter shall be allowed with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence. A boat may be a "dwelling unit" for section 280A purposes. Section 280A(f)(1)(A).
Section 280A(d) defines the term "use as residence" for section 280A purposes as follows: (d) USE AS RESIDENCE.-- (1) IN GENERAL.--For purposes of this section, a taxpayer uses a dwelling unit during the taxable year as a residence if he uses such unit (or portion thereof) for personal purposes for a number of days which exceeds the greater of-- (A) 14 days, or (B) 10 percent of the number of days during such year for which such unit is rented at a fair rental. For purposes of subparagraph (B), a unit shall not be treated as rented at a fair rental for any day for which it is used for personal purposes. (2) PERSONAL USE OF UNIT.--For purposes of this section, the taxpayer shall be deemed to have used a dwelling unit for personal purposes for a day if, for any part of such day, the unit is used-- (A) for personal *301 purposes by the taxpayer or any other person who has an interest in such unit, or by any member of the family (as defined in section 267(c)(4)) of the taxpayer or such other person; (B) by any individual who uses the unit under an arrangement which enables the taxpayer to use some other dwelling unit (whether or not a rental is charged for the use of such other unit); or (C) by any individual (other than an employee with respect to whose use section 119 applies), unless for such day the dwelling unit is rented for a rental which, under the facts and circumstances, is fair rental. The Secretary shall prescribe regulations with respect to the circumstances under which use of the unit for repairs and annual maintenance will not constitute personal use under this paragraph, except that if the taxpayer is engaged in repair and maintenance on a substantially full time basis for any day, such authority shall not allow the Secretary to treat a dwelling unit as being used for personal use by the taxpayer on such day merely because other individuals who are on the premises on such day are not so engaged. [5] *302 In this case petitioners' personal use of the Hippocanudius did not exceed 14 days. Mr. McLarney testified at trial that he and his wife used the boat for personal purposes on only seven days in 1977. Mr. McLarney's testimony was candid, forthright and completely credible. The engine log, which substantially was a contemporaneous record, supports petitioners' position. Also, the service checks contained no element of personal use because petitioner performed them as part of the chartering operation to maintain to boat in charter-ready condition in order to attract and satisfy customers. The repairs, too, arose from damage sustained during charter voyages. But even if the two repair days are included as personal use, petitioners' total personal use of nine days would still fall short of the 14-day threshold contained in section 280A(d)(1). Respondent introduced *303 no evidence to controvert petitioners' testimony. In his brief, however, respondent argues that petitioners' position that their personal use of the boat was so limited is incredible because it implies that the boat was not used for 282 days. Respondent argues that the boat must have been used on more days than the amount reflected in petitioners' testimony because of the size of the investment in the boat. Respondent argues that this speculative additional use is personal use. A review of all the circumstances and our opportunity to view Mr. McLarney's demeanor during the trial convinces us that petitioners' personal use of the boat in 1977 did not exceed 14 days. Accordingly, we hold that petitioners did not use the boat as a "residence" in 1977. Section 280A(d)(1). Therefore, section 280A does not apply to limit petitioners' deductions arising from the boat chartering activity in 1977. Section 183
Because section 280A does not apply to the 1977 boat chartering activity we must analyze respondent's alternate argument based on section 183. [6] *305 Section 280A(f)(3). As previously discussed respondent bears the burden of proving that the 1977 boat chartering operation constitutes *304 an activity not engaged in for profit. Ordinary and necessary expenses and depreciation attributable to an activity not engaged in for profit are deductible only to the extent of gross income derived from such activity, less the amount of the deductions which are allowable whether or not the activity is engaged in for profit. Section 183(b); section 1.183-1(b)(1), Income Tax Regs.
An activity not engaged in for profit is defined in section 183(c) as one for which deductions under sections 162 and 212(1) and (2) are not allowable. In deciding whether an activity is described in section 183, the focus is on the intent with which the taxpayer entered into and engaged in the activity. The standard to be applied is whether the taxpayer had an actual and honest profit objective in entering into the activity. Dreicer v. Commissioner,78 T.C. 642 (1982), on appeal (D.C. Cir. June 1, 1982); section 1.183-2(a), Income Tax Regs. The determination of the taxpayers' objective is to be based on all the facts and circumstances, with greater weight placed on objective facts than *306 on the taxpayer's statement of intent. Churchman v. Commissioner,68 T.C. 696, 701 (1977). Section 1.183-2(a), Income Tax Regs.Section 1.183-2(b), Income Tax Regulations, lists some of the factors which normally are taken into account in a section 183 determination. Allen v. Commissioner,72 T.C. 28, 33 (1979). [7] Our evaluation of the entire record convinces us that *307 petitioners' 1977 boat chartering activity constitutes an activity engaged in for profit. This decision is based on the confluence of several factors. First, petitioners carefully investigated the boat chartering business before entering it. They considered several businesses in 1976. Petitioners decided that boat chartering was best for them only after analyzing the costs, risks and returns of several other activities and after considering their ability to manage effectively each alternative. Similarly, petitioners carefully considered the features of several boats before selecting a boat to charter. They based this latter determination on a set of criteria they received from Mrs. Ledger who had operated successfully in the Seattle chartering market for more than 25 years. Petitioners also calculated a break-even point: the level of activity beyond which they would make a profit. Based on these considerations petitioners decided to risk their money. These careful investigations to insure the best chance for profitability strongly indicate that petitioners engaged in the boat chartering activity for profit. Jackson v. Commissioner,59 T.C. 312 (1972); section 1.183-2(b)(2), Income Tax Regs. *308 Respondent points out that petitioners, in making the decision to start a boat chartering operation, relied to a certain extent on information and advice provided by an interested party. Mrs. Ledger provided a set of criteria for boat selection and estimates of weekly rentals. Mrs. Ledger's company, LMC, was the sales agent when petitioners purchased their boat and was petitioners' exclusive leasing agent for 1976. Buying and chartering a boat on the advice of such an interested party may indicate the lack of a profit objective in the chartering activity. See Lyon v. Commissioner,T.C. Memo. 1977-239. In this case, however, we are convinced that petitioners' use of Mrs. Ledger's information was consistent with their propensity to acquire and to critically examine all relevant information in the investment process. This conclusion is supported by the fact that petitioners requested information on successful chartering operations and applied it in their own selection process. They did not passively accept advice to purchase a particular boat. Contrast Lyon v. Commissioner,supra.In these circumstances we think that petitioners' solicitation and use of Mrs. Ledger's information *309 constitutes the type of consultation with experts which indicates that the taxpayers had a profit objective. Section 1.183-2(b)(2), Income Tax Regs.
Respondent also argues that petitioners did not have a profit objective because they hoped only to break even in chartering the boat. Apparently respondent derives this argument from Mr. McLarney's use of the term "objective occupancy" as a synonym of the break-even level of chartering. However, it is clear from the context of Mr. McLarney's testimony that the break-even level was only the minimum objective. Mr. McLarney explained that the petitioners intended to earn as much profit as possible and that breaking even was only the first step to achieving this goal. Accordingly, we think that petitioners' use of a break-even calculation in deciding whether to enter the boat chartering market indicates careful planning which supports a finding of profit objective. We also note that petitioners did not include insurance costs or estimated repair expenses in their break-even calculation. Such a miscalculation could imply a nonbusiness-like approach. However, we think that petitioners attempted to accurately calculate the break-even point. *310 Their mistake made it more difficult for them to make a profit. But it does not change our conclusion that petitioners' thoughtful and detailed investigation of boat chartering before entering the activity indicates a profit objective for chartering the boat. A second factor indicating that petitioners chartered their boat with a profit objective is that petitioners changed their mode of operation to increase profitability in 1977 when the 1976 arrangements proved unsatisfactory. In 1976 petitioners had an exclusive leasing agreement with LMC. This arrangement meant that LMC would find charters for petitioners but that petitioners could not themselves, or through another agent, arrange additional charters.LMC obtained only two one-week charters for petitioners' boat during 1976. Dissatisfied with this performance, petitioners did not renew the exclusive leasing agreement with LMC. Instead, petitioners listed the boat with LMC and with Normandy Northwest for advertising and chartering on a nonexclusive basis. In addition, Mr. McLarney tried to stimulate business through personal contacts and personal advertising. These changes in operation helped to increase the number of charters *311 from two in 1976 to 11 in 1977. This abandonment of an unprofitable method of operation in favor of a new approach designed to attain more income and involving a more active role by petitioners indicates a profit objective. Section 1.183-2(b)(1), Income Tax Regs. Contrast Lyon v. Commissioner,supra, in which the taxpayer never investigated the feasibility of changes which might have turned a money losing chartering operation into a profitable business.
A third factor indicating that petitioners chartered their boat with a profit objective is that Mr. McLarney spent substantial time and energy on a regular basis to operate the activity. From their first investigation in 1976 of alternative business investments, petitioners indicated a desire to be involved in an activity which they could actively manage. Petitioners did not want merely to invest in a passive income fund. Mr. McLarney regularly performed system checks to keep the boat in charter-ready condition. He, with a friend, performed ordinary maintenance. He also was available to give demonstration rides and to conduct post-charter checks at the customers' convenience. Petitioners relied on other companies for part of their *312 advertising and for major repairs, but Mr. McLarney was available generally and performed most of the day-to-day activities associated with keeping the boat ready to charter. The nature and extent of this activity indicates that petitioners had a profit objective for chartering their boat. Section 1.183-2(b)(4), Income Tax Regs. Contrast Lyon v. Commissioner,supra, in which the taxpayer, who only vacationed in the Virgin Islands, had a boat in the Virgin Islands which was maintained principally by a local boat company. Respondent argues that petitioners' full-time jobs in unrelated fields and their sources of nonchartering income indicate that they did not engage in chartering for profit. However, having another full-time job does not, in itself, require the imposition of the section 183 limitation on deductions. [8] We think that the fact that Mr. McLarney spent substantial time and effort in a businesslike fashion in the chartering operation in addition to his job with the telephone company indicates that petitioners' wanted to make more money than they earned from their full-time jobs. Respondent also cites petitioners' *313 failure to obtain a commercial captain's license as indicating the lack of a profit objective. We disagree. Bare boat chartering is itself a business. Potential customers are likely themselves to be able to operate boats shorter than 36 feet.Petitioners' boat, therefore, had a substantial market for bare boat chartering. Also, petitioners' willingness to risk their boat on a bare boat basis indicates a business motivation rather than solely a personal motivation in chartering the boat. Contrast Jones v. Commissioner,T.C. Memo. 1978-290, in which the taxpayer was unwilling to charter her boat on a bare boat basis. Petitioners protected themselves against the risk inherent in bare boat charters by requiring, in a businesslike fashion, prospective customers to adequately dock the boat during the demonstration ride. This exercise indicated the customer's seamanship and ability to handle petitioners' boat. We think that petitioners' operation of the activity indicates a profit objective. A fourth factor indicating a profit objective is petitioners' maintenance of business records. Respondent argues that petitioners did not keep adequate records. However, the parties stipulated the *314 1977 engine log. Also, at trial Mr. McLarney testified that petitioners kept an engine log, an expense log and a revenue log which recorded every financial and mechanical activity conducted on their boat. We found his testimony credible. No evidence indicates the contrary. Accordingly, we find that petitioners maintained business records concerning the boat chartering activity. Contrast Lyon v. Commissioner,supra.Complete and accurate records indicate a businesslike conduct of the activity which evidences a profit objective. Section 1.183-2(b)(1), Income Tax Regs.
Respondent argues that petitioners purchased the boat for personal pleasure. Accordingly, respondent argues that petitioners chartered the boat simply as a means of recouping in part the costs of the boat. Petitioners enjoyed boating.They derived satisfaction from personally using their boat. The presence of personal motives may indicate a lack of a profit objective, particularly if recreational elements are present. Martin v. Commissioner,50 T.C. 341 (1968); section 1.183-2(b)(9), Income Tax Regs.
However, "suffering has never been made a prerequisite for deductibility." Jackson v. Commissioner,59 T.C. 312, 317 (1972). *315 "[T]he fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is in fact engaged in for profit as evidenced by other factors…." Section 1.183-2(b)(9), Income Tax Regs.
We are convinced in this case that the personal pleasure of owning and using the boat was secondary to the primary objective of owning and chartering the boat for profit. Petitioners' personal use of the boat was limited. They used the boat only seven times in 1977, each time for only one day. This personal use is small in absolute terms and in comparison with the total business uses (charters, demonstration rides, post-charter checks and periodic service checks) consisting of 48 occasions for 74 days. Contrast Martin v. Commissioner,supra,Blake v. Commissioner,T.C. Memo. 1981-579, on appeal (2d Cir., May 13, 1982), and Carter v. Commissioner,T.C. Memo. 1978-202, affd. 645 F.2d 784 (9th Cir. 1981). Based on this statistic and on the other indicia of petitioners' businesslike method of operation we think that profit objectives deminated personal recreational objectives in their owning *316 and chartering the boat. Respondent also argues that depreciation of the value of the boat indicates the lack of a profit objective. On the facts of this case we cannot agree with respondent. Petitioners selected their boat in part because it was older, and thus cheaper. Petitioners calculated that it had, at that time, depreciated as much as it would. Their calculation was supported by a professional appraisal performed in April, 1978, which indicated that the boat had depreciated in value only by about $500 in the 21 months they had held it. Petitioners ultimately sold the boat at a depreciated amount because of its 1978 accidental submergence. We are also unconvinced by respondent's argument that Mr. McLarney effectively conceded his case at trial when he said that he did not know that the boat chartering activity was "a trade or business" until he started doing research in preparation for this case. We understood petitioner's comment to mean that he was unfamiliar with the legal labels applied in the Internal Revenue Code or with their consequences until he examined them closely. We certainly do not think that Mr. McLarney was conceding petitioners' case or that this statement *317 in any way qualifies his other statements concerning profit objectives. Based on our consideration of the entire record we conclude that petitioners engaged in the 1977 boat chartering activity for profit. Although petitioners lost money in 1976 and 1977, we are convinced by their planning, their change of methods to increase profitability and their general businesslike manner of participating in the activity that they engaged in chartering for a profit.Accordingly, we hold that the section 183 limitations are not applicable to the boat chartering activity for the tax year 1977. We note that petitioners introduced all of the relevant evidence on which we base our conclusion for 1977. Accordingly, although we hold that respondent failed to carry his burden of proof on the section 183 issue for that year, we would have held that petitioners are entitled to their full deductions from the chartering activity even if they had had the burden of proof on this matter. Tax Year 1978
The only issue for 1978 is whether section 183 applies to limit petitioners' deductions from the chartering activity. This issue was raised properly by the respondent in the deficiency notice. Therefore, petitioners *318 have the burden of proof on this issue for 1978. Rule 142(a). On January 6, 1978, petitioners moved to New Jersey because Mr. McLarney was transferred by his employer. This move was not anticipated by petitioners when they started chartering their boat in 1976. The New Jersey move was initiated late in 1977. Because of their move petitioners were unable to participate directly in chartering their boat in 1978. Petitioners listed the boat for sale. They also listed the boat for charter until it was sold in September, 1978. Respondent argues that petitioners' move, their lack of direct involvement in chartering and the sale of the boat in 1978 compel the conclusion that petitioners' 1978 chartering activity was not engaged in for profit. We disagree with respondent. We do not think that petitioners' objective of chartering the boat changed overnight on January 6, 1978, because of the unanticipated move. We think that petitioners entered 1978 with the same profit objective which we found that they had in 1977. [9] Also, we think that petitioners maintained their profit objective during 1978. They investigated the possibility of moving the boat to New Jersey to continue the chartering *319 operation there. Only after petitioners discovered that it was impractical to move their boat did they decide to abandon this idea. Because they could not conduct the chartering business themselves petitioners decided to sell the boat. They listed it for charter at the same time that they listed it for sale. The boat was sold in September, 1978.The boat was not chartered that year. The fact that the boat was not chartered in 1978 hurts petitioners' claim that they were in the chartering activity for profit. However, the other facts convince us that petitioners remained profit motivated in 1978. They investigated moving the business. When that alternative proved impractical they entrusted a professional with selling and chartering the boat. Petitioners' prompt repair of the boat after an accidental submergence in March, 1978, and the return of the boat to charter availability indicates petitioners' continued interest in chartering. We think that petitioners did all that they could do in 1978 to engage in a profitable chartering *320 operation, given the circumstances of an unanticipated move. Petitioners' prompt withdrawal from the chartering market when they could not effectively operate the activity also indicates that petitioners were interested in a profitable charter operation rather than in using the charter expenses solely to offset other income. Based on a review of the entire record we conclude that petitioners' 1978 chartering operation constitutes an activity engaged in for profit. Accordingly, we hold that section 183 does not apply to limit petitioners' deductions from the chartering activity.
Decisions will be entered for the petitioners.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 in effect for the years in issue, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure.↩
2. We note that this figure differs from the stipulated amount. However the parties agreed at trial that 44 days was the correct number.↩
3. We note that the figures which we find to have been deducted by petitioners in 1977 differ from some of the figures stipulated for this purpose by the parties. The difference arises from the fact that the stipulated figures, unlike the amounts actually deducted, are not all reduced by an amount attributable to petitioners' personal use.
4. We note that respondent articulates additional issues in his brief: whether petitioners' boat chartering activity constituted a trade or business or an activity for the production of income. Sec. 183(c) defines an activity not engaged in for profit as an "activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Thus the arguments raised by respondent on brief inherently are part of the sec. 183↩ analysis. Accordingly, we do not have to separately allocate the burden of proof or decide these issues.
5. We note that the clause in this final sentence which follows the word "paragraph" was added by the Black Lung Benefits Revenue Act of 1981 sec. 113(d), Pub. L. 97-119, 95 Stat. 1635, 1642. If germane to the facts of this case (which it is not), it would be applicable here due to its retroactivity to tax years beginning after December 31, 1975. Black Lung Benefits Revenue Act of 1981 sec. 113(e), supra.↩
6. The relevant portions of section 183 are: SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) GENERAL RULE.--In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) DEDUCTIONS ALLOWABLE.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). (c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED. -- For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212↩.
7. Section 1.183-2(b), Income Tax Regs.↩, sets forth the following relevant factors to be considered in determining whether an activity is engaged in for profit, although no one factor is controlling; (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved in the activity.
8. See, e.g. Palmer v. Commissioner,T.C. Memo. 1981-354↩.
9. We note that we would have found petitioners to be profit motivated in the 1977 chartering activity even if they had the burden of proof on that issue.↩