RICHARD A YANCY AND IRENE YANCY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Yancy v. Commissioner
Docket No. 8927-83.
United States Tax Court
T.C. Memo 1984-431; 1984 Tax Ct. Memo LEXIS 241; 48 T.C.M. (CCH) 872; T.C.M. (RIA) 84431; August 13, 1984. *241 From 1971 through 1983, petitioners engaged in horse-racing and horse-breeding activities. They lost money from these activities every year, generally in amounts equal to 30 to 50 percent of their income. During 1979 and 1980 (the years in issue), all of petitioners' income was wages from petitioner-husband's jobs as a truck driver and a steelworker, and petitionerwife's part-time job. On the facts, held: petitioners engaged in the horse-racing and horse-breeding activities during 1979 and 1980 with the actual and honest objective of making a profit. Richard A. Yancy and Irene Yancy, pro se. Robert S. Scarbrough, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Febderal individual income tax against petitioners for 1979 and 1980 in the amounts of $4,170 and $5,968, respectively. The issue for decision is whether petitioners' horse-racing and horse-breeding activities constitute a trade or business, or an "activity * * * not engaged in for profit", within the meaning of section 183(a). [1]
FINDINGS OF FACT Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference. When the petition was filed in the instant case, petitioners, Richard A. Yancy (hereinafter sometimes referred to as "Richard") and Irene Yancy (hereinafter sometimes referred to as "Irene"), husband and wife, resided in East Cleveland, Ohio. In 1971, petitioners bought their *243 first horse, with a view to breeding horses and selling the foals. Richard had ridden horses in his childhood days is South Carolina, but Irene had never ridden a horse. Between 1971 and 1980, petitioners bought 15 horses (4 in 1971, 2 in 1972, 1 in 1973 or 1974, 5 others in 1974, 2 in 1977, and 1 in 1980), for a total cost of $5,031. One of these horses (the one bought in 1980) cost $1,000; the others cost from $150 to $470 each. Petitioners had no previous experience with horse racing or horse breeding. They bought books and periodicals about profitable horse breeding; the attended a seminar on the subject at Ohio State University; they associated with people who were somewhat successful at this activity. Petitioners did not have any formal training with respect to racing or breeding horses. Petitioners bought undernourished animals with what appeared to be good blood lines. They did so because such animals could be acquired for little money and, petitioners reasoned, when such animals were restored to proper condition the animals should be able to produce profitable foals. Petitioners encountered a series of misfortunes. One horse slipped in mud, broke its shoulder, and *244 had to be destroyed. Another horse went blind; it was sold cheaply. A mare which was bred turned out to be barren. Another mare's foal was aborted. None of the 15 horses petitioners bought was sold for a profit, nor did any appreciate in value. Petitioners never sold a foal. Petitioners oversaw and controlled all facets of their horseracing and horse-breeding activities. Petitioners hired and fired the trainers of their horses. Petitioners paid their own bills and maintained the records of income and expense for their activities without using professional assistance. [2]
Petitioners' receipts from their horse-racing and horsebreeding activities were little in amount. In several of the years (including 1979 and 1980), petitioners had no gross receipts from these activities at all. In each year from 1971 through 1983, petitioners suffered substantial losses; generally these losses amounted to 30 to 50 percent of *245 their total income. For 1979 and 1980, petitioners' losses from their horse-racing and horse-breeding activities amounted to $13,748 and $19,730, respectively. In 1983, they finally gave up these activities. Richard had two simultaneous full-time jobs from 1974 to 1980, being employed as a truck driver by the City of East Cleveland and as a steelworker by Republic Steel Corporation. Irene was employed part-time by Servomation Corporation in 1979 and 1980. Petitioners' only other business activity was renting property bought in 1978. This property produced losses in 1978, 1979, and 1980. Petitioners financed their horse-racing and horse-breeding activities from their wages. The horses petitioners bought were ridden by Richard an average of about twice a year.Irene never rode these horses. When their child wanted to ride a horse, petitioners bought a pony. Petitioners did not deduct the expenses of the pony. Petitioners were never involved in a "show horse" activity. Petitioners' horses were kept on rented premises. Petitioners did not own any grazing land or other facilities for the care and maintenance of horses. Petitioners' depreciation deductions were only for the *246 purchase prices of their horses, bridles, and saddles. * * * Petitioners engaged in their horse-racing and horse-breeding activities in order to make profits so as to enable them to raise their economic standard of living. OPINION Respondent contends "that, well before the years in issue (1979 and 1980), the petitioners knew full will that, whatever its purpose, their horse 'business' was not 'for profit'." Respondent asserts that "petitioners have not produced a scintilla of evidence" to show that they satisfied the objective criteria mandated by the statute and regulations. Petitioners maintain that they entered into their horse-racing and horse-breeding activities with the honest and genuine objective of making a profit, and that this objective continued through the years in issue. We agree with petitioners. In the context of the instant case, the effect of section 183(a)[3] is that petitioners' disputed deductions are allowable but only if their horse-racing and horse-breeding activities were engaged in for profit. *247 Whether an activity is engaged in for profit turns on whether the taxpayer has an actual and honest objective of making a profit. Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (CADC 1983); Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (CA9 1981). Petitioners' objective is a question of fact to be determined from all the facts and circumstances. Allen v. Commissioner,72 T.C. 28, 34 (1979); Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. without published opinion 607 F.2d 995 (CA2 1979), affd. on another issue 615 F.2d 578 (CA2 1980). Mere statements of intent are not determinative. Engdahl v. Commissioner,72 T.C. at 666; Churchman v. Commissioner,68 T.C. 696, 701 (1977). The burden of proof is on petitioners. Golanty v. Commissioner,72 T.C. at 426; *248 Boyer v. Commissioner,69 T.C. 521, 537 (1977). The regulations under section 183 list nine relevant factors which should normally be taken into account in determining whether an activity is engaged in for profit. No one factor is conclusive and thus we do not reach our decision herein by merely counting the factors enumerated in section 1.183-2(b), Income Tax Regs., which support each party's position. Dunn v. Commissioner,70 T.C. at 720. We observed both petitioners and we conclude that they are honest and believable witnesses. We believe that they started, and continued, their horse-racing and horse-breeding activities in order to make a profit so as to enable them to raise their economic standard of living. They proceeded foolishly. It may be that others took them for a ride. By the years in issue, they should have cut their losses and quit, or else changed their operations drastically.Instead, they continued for several more years, draining themselves and their pocketbooks. Their losses were real, out-of-pocket losses, *249 and not merely tax losses. Petitioners did not have other wealth to fall back on; their horse activities were financed from current wages. Horatio Alger's formula did not seem to work for petitioners in their endeavor. Petitioners did not engage in their horse-racing and horse-breeding activities as a lark; it was not a hobby; the household did not use the horses for personal pleasure in riding or at horse shows. On the one hand, we have noted that "a business will not be turned into a hobby merely because the owner finds it pleasurable" ( Jackson v. Commissioner,59 T.C. 312, 317 (1972)). On the other hand, it seems highly likely that if a person expends substantial funds on an activity year after year, deriving no obvious pleasure from the activity, then the activity is engaged in with the objective of making a profit, and not engaged in as a hobby. We conclude that, in 1979 and 1980, petitioners engaged in their horse-racing and horse-breeding activities with an actual and honest (albeit misguided) objective of making a profit. We hold for petitioners. Decision will be entered for petitioners.
Footnotes
1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the years in issue.↩
2. Respondent concedes the correctness of the amounts of petitioners' claimed deductions for 1979 and 1980; he has not disputed the correctness of the amounts of petitioners' claimed deductions for any of the other years as to which evidence was introduced.↩
3. SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) General Rule.--In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. [The subsequent amendment of this provision by section 5(a)(23) of the Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669, 1694, does not affect the instant case.]↩