EDWARD A. UNDERWOOD AND IRENE E. UNDERWOOD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Underwood v. Commissioner
Docket No. 4507-88
United States Tax Court
T.C. Memo 1989-625; 1989 Tax Ct. Memo LEXIS 624; 58 T.C.M. (CCH) 731; T.C.M. (RIA) 89625; November 20, 1989
David S. Lee and Lage E. Anderson, for the petitioners. Patricia Montero, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined income tax deficiencies for 1981, 1984, and 1985 in the amounts of $ 2,624, $ 8,675, and $ 4,871, respectively. The deficiencies are attributable to petitioners' boat chartering activity. In this opinion we consider the following issues: (1) Whether petitioners' activity was not engaged in for profit; (2) whether petitioners' charter boat was placed in service in 1984; and (3) whether petitioners are entitled to an investment tax credit with respect to the boat in issue. In the event that we find that the activity was engaged in for profit and that the boat was placed in service in 1984, petitioners concede that they are only entitled to a depreciation deduction for part of the 1984 year. FINDINGS OF FACT The stipulation of facts and attached exhibits are incorporated by this reference. At the time their petition in the present case was filed, petitioners Edward A. and Irene E. Underwood resided *627 in San Mateo, California. Petitioners (who were married at all times pertinent to this case) filed joint Federal income tax returns for years 1981, 1984, and 1985. The Underwoods were experienced in business and were seasoned investors. Petitioner Edward Underwood [1] owned Humboldt Distributors, a wholesale distributor of candy, tobacco, paper goods, and other sundry items, operating in the San Francisco peninsula area. This business was operated by petitioner, his wife, his brother, and 20 full-time employees. Petitioner was employed by Humboldt, on a full-time basis, as a warehouse manager. Mrs. Underwood worked as the company's bookkeeper. In 1981, 1984, and 1985, petitioners reported total wages from Humboldt Distributors of $ 51,300, $ 68,708, and $ 62,508, respectively. The Underwoods also owned certain rental property located at 1112 So. "B" Street in San Mateo, California. Excluding depreciation deductions, petitioners realized a net loss from this property in each of the years under consideration. Petitioners also received interest income in all three years. *628 Petitioner is an avid, year-round fisherman. He began boating in 1980 when he purchased a 22-foot powerboat named the "Sea Ray." This speedboat was used by petitioner's family for water-skiing and other recreational boating. Petitioner also used this boat throughout the year for fishing trips with friends. On occasion, he also used the boat to provide trips of a fund-raising nature. In connection with this pleasure boating, petitioner completed a course on general navigation and seamanship offered by the U.S. Coast Guard in 1981. By 1984, petitioner was contemplating moving up to a larger boat. As early as February of that year, petitioner began looking for a boat in need of repairs which he could purchase and invest time and money to repair. Petitioner hoped such a boat would appreciate in value. He sought a powerboat which could be handled with the assistance of one other person. In March 1984, petitioner enrolled in and subsequently completed an 8-week, large powerboat handling class offered by Horizons Charter and Yachting Association, Inc. (hereinafter "Horizons"). Horizons is located in Alameda, California, which is across the bay and approximately 1-1/2 hours from petitioner's *629 home. Horizons was a full-service club, offering sailing classes and social events for its members. The club also entered into agreements with some of its members whereby Horizons, acting as an agent, chartered its members' boats. There were 3 powerboats in the club's charter fleet, and of the 90 club members, only 3 were powerboat owners. In fact, the chartering market at Alameda was more active for sailboats than motorized yachts. While he was attending the powerboat course, petitioner acquired an article written by Horizons' president, Laurie Smith, entitled "Profile of Charter Yacht Investments." This article was available in the reception area at Horizons. Smith's article discussed the tax advantages of a charter yacht such as the investment tax credit and depreciation and operating expense deductions. It also discussed methods of establishing the business and identified investment criteria for potential charter owners. Specifically, the author urged the investor to interview several charter companies and to compare them in the following areas: (1) First impressions of the charter company and its staff; (2) company and boat location, i.e., whether the berthing situation *630 is good for both the owner and the charter business; (3) advertising and promotion provided by the company; (4) the level of activity the owner can expect from the boat, with particular consideration given to the yacht size most popular at that location; (5) the company's boat maintenance program; (6) the checkout procedures for screening potential customers and the responsibility for boat damage; (7) the competitiveness of charter rates; (8) accounting procedures for reporting charter income and expenses; and (9) insurance coverage and the working relationship between the yacht owner and the charter company. Petitioner read this article prior to purchasing his second boat. Petitioner discussed the charter investment with his instructor during one of his classes at Horizons. The instructor told petitioner that the club would like to have more powerboats. Petitioner also spoke to the three powerboat owners at Horizons. However, none of his conversations with these people or with the instructor focused on the profitability of the charter ventures, the number of times a boat could be expected to go out on charter per month, or the expenses involved in operating a charter business. *631 Petitioner was satisfied that people did not state that chartering with Horizons was a bad deal. Petitioner approximated charter income and expenses and estimated that it would take five or six charters a month to cover his expenses and make a profit. However, at no point did petitioner undertake an actual calculation or written evaluation of income and expenses of the activity. In June 1984, petitioner purchased a second powerboat, a 33-foot Viking named the "Beeline." Petitioner waited until the owner reduced the Beeline's purchase price approximately $ 10,000 before he purchased the boat. The boat was 10 years old at the time of purchase. Despite its age and condition, the Beeline was attractive to petitioner because it was a "fixer-upper" and it could be handled with the assistance of one other person. Petitioner paid a total of $ 59,000 for the boat which consisted of a $ 55,000 purchase price plus approximately $ 4,000 in taxes. Petitioner borrowed part of the $ 59,000 from Crocker National Bank. Petitioner also spent $ 12,309.37 on improvements which provided a $ 71,112 depreciable basis in the boat. Petitioner retained a marine surveyor to inspect and appraise the *632 Beeline. The survey estimated the replacement value to be $ 125,000 and the market value to be $ 55,000. From June through December 1984, petitioner devoted almost all weekends and three or four nights every week to the restoration of the Beeline. The repairs consisted of painting, changing the electrical systems, and installing safety devices. Petitioner did this work himself and many of the repairs were completed on the basis of defects turned up by the marine survey. Some of the improvements were also made with a view toward complying with equipment requirements imposed on all Horizon charter vessels. For instance, petitioner installed a first-aid kit, cookware, and utensils as required by a Horizons equipment list. However, some improvements were clearly made for petitioner's personal use or convenience and were not required by Horizons (i.e., microwave, towels, pillows, Mr. Coffee coffee maker). During this period, the Beeline was berthed in either Oyster Point Marina or at Brisbane Marina. Both berthing locations were used on a temporary basis while petitioner made repairs and improvements to the boat. While petitioner used the boat to test repairs, very little of this *633 use was for personal or recreational purposes. Based on his positive experience with the sailing school and on conversations with Horizons personnel and club members, petitioner decided to charter the Beeline through Horizons. Accordingly, in late December 1984, petitioner entered into a charter management agreement with Horizons. Pursuant to the agreement, petitioner paid Horizons an $ 1,800 placement fee representing acceptance of petitioner's vessel into the charter program. The fee was paid on December 28, 1984. Under the agreement, Horizons had the exclusive right to arrange charters for the Beeline. Horizons was also entitled to 45 percent of all charter fees collected. Additionally, Horizons was required to provide janitorial services as necessary to keep the Beeline clean and ready for charter. It provided such janitorial services to the charter owners without charge after each charter. Petitioner, however, was required to undertake any maintenance necessary to keep the boat in a fit and seaworthy condition, such as periodic hull and bottom cleaning and topside waxing and cleaning. The charter management agreement provided that Horizons agreed to exert all reasonable *634 effort to advertise and schedule the Beeline for charter. However, Horizons' only promotional procedure was to show the boat along with its other powerboats when a prospective customer showed up. Horizons did not otherwise advertise the boat. While the Beeline was at Horizons, it was chartered only seven times. Despite this small number of charters, petitioner did not take any independent action to advertise or promote the boat. Petitioner did not maintain a separate account for the Beeline charter activity. However, using personal checks and receipts, he did prepare a summary of the boat's cost of repairs and improvements incurred up to December 28, 1984. Petitioner continued to keep receipts and/or checks of expenses incurred. Additionally, once the boat was under charter arrangement, petitioner received monthly income and expense statements from Horizons. These statements detailed charter activity, maintenance, gas, and supply expenses incurred at Horizons. They also included two charges for bottom cleaning undertaken by Horizons' personnel. Excessive gasoline credits on the income statements for April and August 1985 show that petitioner made some personal use of the *635 Beeline while the boat was under charter to Horizons. Petitioner and Horizons terminated their charter agreement on August 7, 1985. Thereafter, petitioner listed the Beeline for sale at Associated Yacht Brokers (hereinafter "Associated") which was located at the same dock as Horizons. He listed the Beeline for sale at an asking price of $ 80,000. Petitioner undertook to sell the boat in order to terminate the Horizons agreement and to see what kind of appraisal he could get. However, despite the terminated contract, the two parties had an agreement that the boat could be used if the club "got in a pinch." The Beeline was in fact borrowed for charter at the end of August 1985. The Beeline was berthed at Associated from August until December 1985. Petitioner received no offer for the Beeline while it was for sale at Associated. Petitioner did not at any point reduce the Beeline's purchase price. Additionally, there were no charters of the boat in 1985 after August. However, petitioner discovered damage to the boat's rudder shaft/packing glands in December 1985 while the boat was still at Associated. The damage to the boat was not charter related. Petitioner ultimately realized *636 that boating interests at Horizons favored sail boats and that there was more powerboat activity in and around Brisbane Marina, a marina located 15 minutes from petitioner's residence and on the same side of the bay. On December 8, 1985, petitioner applied for a berth at the Brisbane Marina. The berthing application listed the Beeline's market value as $ 55,000. Despite this change in location, the Beeline was not available for charter until the fall of 1986. Petitioner became mentally fatigued and "burned out" with respect to the charter activity and temporarily abandoned the activity until October of 1986. However, during this time, petitioner spent approximately $ 1,750 on general maintenance and repair of the boat. These expenses were paid as they came due. Of this amount, only $ 122 was expended to repair the Beeline's packing glands. There were no repairs for burned valves. On or about October 18, 1986, petitioner entered into a management contract with Black Tie Cruising and Charter Company which was located at the Brisbane Marina. Black Tie was similar in purpose and operation to Horizons. In most respects, the terms of the agreement were also similar to those in *637 the Horizons agreement. Petitioner decided to place the Beeline under charter with Black Tie because of its proximity to his residence, because of its lower monthly slip rentals, and because of his latent awareness that the Brisbane side of the bay was a more active powerboat community than Alameda. The Beeline was under a charter agreement with Black Tie from October 1986 until June 1987 when Black Tie ceased operations. Petitioner received monthly statements of income and expense from the company. These records show that the Beeline was chartered only once in 1986 and three times in the spring of 1987. The last charter occured on May 24, 1987. After Black Tie terminated operations, the Beeline was not chartered again until April 13, 1988. However, petitioner submitted a major claim to TransPac Insurance Agency for the Beeline with a date of loss of July 20, 1987. The damage necessitated a complete overhaul of one engine and cost a total of approximately $ 21,000. This damage was not charter related. Nonetheless, these repairs kept the Beeline in drydock from October 17, 1987, until February 22, 1988. While the Beeline was being repaired, petitioner completed a course *638 at Crawford Nautical School which enabled him to qualify for and to acquire his U.S. Coast Guard license. He obtained this license in February 1988. It allowed him to operate for compensation a propelled passenger carrying vessel of not more than 100 gross tons. Once the repairs were completed, petitioner moved the Beeline to Pillar Point Marina located on the Pacific coast. Thereafter, petitioner operated the Beeline for charter from April 1988 until October 1988. During this time, he operated charters on the weekends and on weekday evenings. Petitioner did not advertise the charter and operated out of Half Moon Bay on a "word-of-mouth" basis. Petitioner submitted a 1-page document listing expenses from April to October 1988. Cash income for this period was approximately $ 595 before deductions for mortgage, repairs, fuel, supplies, and depreciation expenses. Both the Sea Ray and the Beeline have engine meters which keep track of the hours of engine use for maintenance purposes. Petitioner kept a log of boat usage based on information generated by the engine meter for both the Sea Ray and the Beeline. However, he did not offer the engine log of either boat during trial. *639 Petitioners reported the following income and expenses from the activity in years 1984-1987: 1984
1985
1986
1987
Gross Receipts
$   -0-  $  1,404 $     83 $ 200
Expenses
16,463 26,571 25,099 *
Net Loss
($ 16,463)
($ 25,167)
($ 25,016)
(  * )
Petitioners' 1984 and 1985 returns were selected for audit. Respondent disallowed the Schedule C deductions in 1984 and 1985 based on his determination that petitioners had not engaged in the charter activity for profit. However, respondent allowed as itemized deductions $ 3,125 in 1984 and $ 4,176 in 1985 in tax and interest expenses pursuant to section 183(b)(1). [2] In his notice, respondent also disallowed an investment tax credit which petitioners had applied toward their 1984 income tax liability and carried back to tax year 1981. Petitioners contested this disallowance in their petition; however, neither petitioners nor respondent raised this issue on brief. *640 OPINION I. Section 183 Issue
Initially, we must decide whether petitioner's boat chartering activity was not engaged in for profit. Section 183(a)[3] provides that individual taxpayers will not be allowed deductions which are attributable to an "activity not engaged in for profit." This term of art is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 [trade or business] or under paragraph (1) or (2) of section 212 [expenses for the production of income]." If an activity is not engaged in for profit, section 183(b)(1) will allow only those deductions which are not dependent upon a profit objective. Section 183(b)(2) will allow all other deductions, but only to the extent of any gross income generated from the activity. *641 Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the actual and honest objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). In making this determination, more weight is accorded to objective facts than to the taxpayer's statement of intent. Sec. 1.183-2(a), Income Tax Regs.; Siegel v. Commissioner, 78 T.C. 659, 699 (1982). Petitioners bear the burden of proving that they possessed the required profit objective. Rule 142(a); Dreicer v. Commissioner, supra; Golanty v. Commissioner, 72 T.C. 411 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). In determining whether an activity *642 is engaged in for profit, reference is made to objective standards, taking into account all of the facts and circumstances of each case. Sec. 1.183-2(a), Income Tax Regs. The regulations set forth nine criteria normally considered for this purpose. The factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the presence of elements of personal pleasure or recreation. Sec. 1.183-2(b), Income Tax Regs.
Petitioner argues that he had the requisite profit objective with respect to his boating activity. Conversely, respondent asserts that the activity was not engaged in for profit. We agree with respondent. Because the parties argued their *643 respective cases by addressing each of the nine criteria enumerated in the regulations, we will follow the same approach in our discussion. 1. The Manner In Which Petitioners Carried On The Activity
Petitioner's method of operating the activity and his hiatus from it in 1985 and 1986 strongly indicate that the activity was not carried on in a business-like manner. Sec. 1.183-2(b)(1), Income Tax Regs.
Petitioner's record keeping was incomplete and is an indicia of a lack of profit objective. We recognize that this is generally not a persuasive factor where the charter company undertakes record keeping responsibilities. Dickson v. Commissioner, T.C. Memo. 1983-723. However, in this case there are large segments of time during which the Beeline was not under a charter agreement and for which there is no record keeping data. Both petitioner and his wife have bookkeeping skills, yet they did not establish a separate account for the Beeline and they did not otherwise keep track of monthly expenses. Compare, Zwicky v. Commissioner, T.C. Memo. 1984-471 (accountant wife maintained accurate financial records *644 for husband's boat chartering business). Given this background, petitioner should have maintained a separate checking account or ledger where monthly expenses and income were posted and from which a periodic evaluation of the business could be made for the purpose of cutting expenses and increasing profits. Golanty v. Commissioner, supra at 430; Engdahl v. Commissioner, 72 T.C. 659, 667 (1979). Petitioner also failed to change the mode of operation to improve profitability. Sec. 1.183-2(b)(1), Income Tax Regs. While the Beeline was under contract with Horizons and Black Tie, the number of charters was nominal. However, petitioner undertook no action to advertise or otherwise promote business for the boat in either charter location. The lack of any changes in operation suggests that petitioner was content to deduct the depreciation and use the credits and was not seriously interested in chartering the Beeline for profit. Petitioner's hiatus from the activity in 1985 and 1986 also belies any assertion that the activity was carried on in a business-like manner. After terminating the charter agreement with Horizons *645 in August 1985, petitioner did not secure another charter arrangement for 14 months. The 14-month hiatus includes a 10-month period in 1986 which petitioner attributes to "burn-out." While petitioner was frustrated with the Beeline's charter performance, a prudent businessman would have nonetheless kept the boat under a charter arrangement while he contemplated methods to revitalize the business. We fail to see why petitioner took so long to charter with Black Tie, especially considering that he was familiar with the Brisbane Marina prior to chartering with Horizons. Moreover, we do not attribute this down period to damaged packing glands, burned valves, or to other repairs of a nature that would keep the boat inoperational for 10 months. All repairs undertaken during this period were paid as they came due and most related to general maintenance. Accordingly, we find that petitioner's temporary abandonment of the activity serves as a further indication that it was not run in a business-like manner. Petitioners argue that their profit objective is evident from the fact that Mr. Underwood approached the repair and restoration of the Beeline in a professional manner; that he was *646 actively involved in the charter of the boat during its tenure at Horizons; and that he took several corrective actions to change from unprofitable methods. Mr. Underwood spent substantial time and effort to restore and repair the boat in compliance with the marine survey and with a view toward compliance with Horizon's equipment list. However, some of the equipment and conveniences placed on the boat during this time can also be viewed as accomodating petitioner's individual tastes in decorating and furnishing the boat. Petitioners also argue that Mr. Underwood continued to be actively involved in the boat while it was under charter. However, the evidence indicates that petitioner's required involvement with the charter arrangement was nominal. Petitioner's assertions that he vacuumed the boat and changed the oil on a bimonthly basis, given the amount of charter activity and Horizon's responsibility to clean the boat, is unpersuasive. Additionally, petitioners failed to offer evidence as to any maintenance Mr. Underwood was required to do regardless of the level of charter activity. Compare McLarney v. Commissioner, T.C. Memo. 1982-461 (taxpayer testified *647 about detailed "system checks" he did on a routine basis when boat was not used for either charter or personal purposes). For instance, Mr. Underwood did not specify whether he undertook maintenance such as hull cleaning, bottom scraping or topside waxing on a periodic basis in order to keep the boat in a seaworthy condition as required by both the Horizons and Black Tie agreements. In fact, the record shows that it was Horizons personnel who did this type of maintenance. Lastly, petitioners argue that they took three actions to minimize the losses and increase the profit potential of the Beeline. Petitioners first contend that they attempted to sell the Beeline in the fall of 1985 to recover their investment. However, we find that Mr. Underwood placed the boat up for sale to terminate the charter agreement and to obtain an appraisal; his motive in undertaking the sale did not relate to minimizing losses. Furthermore, he made no effort to reduce the excessive list price and to effectuate a sale. Petitioners also assert that they intended to cut costs by listing the Beeline for charter at the less costly Black Tie organization if it could not be sold with Associated. Given *648 the 14-month gap between charter contracts and the 10-month gap between the lapse of the listing agreement and the Black Tie agreement, we find this argument unpersuasive. Finally, petitioners state that Mr. Underwood decided to obtain his charter license and to personally charter the Beeline after the two charter companies failed to generate an economic success. While petitioner made an effort to conduct the charter activity by himself in 1988, in light of the other evidence on this point, we do not find this fact to be persuasive evidence that the activity was run in a business-like manner. Moreover, the lack of advertising and systematic record keeping indicate that the activity was not being run in a business-like manner. Petitioners have also failed to convince us that the Pillar Point operation, net of all expenses, was profitable. 2. The Expertise Of The Taxpayer Or His Advisors
Careful investigations of a potential business to insure the best chance for profitability strongly indicate an objective to engage in the boat chartering activity for profit. Sec. 1.183-2(b)(2), Income Tax Regs. *649 ; Jackson v. Commissioner, 59 T.C. 312, 316 (1972); McLarney v. Commissioner, supra.While a formal market study is not required, a basic investigation of the factors that would affect profit is. Burger v. Commissioner, T.C. Memo. 1985-523, affd. 809 F.2d 355 (7th Cir. 1987). Petitioner and his wife were successful in business and were experienced investors. They owned and operated a rental property investment as well as a wholly owned distributorship which generated a comfortable salary. Despite this business background, petitioner failed to adequately investigate the charter business before investing in the Beeline. Prior to purchasing the Beeline, petitioner read an article delineating the criteria to consider before investing in a charter arrangement. Consequently, he was aware that the investment decision should be based on a comparison of several charter companies in several areas. There is no indication that petitioner ever made such a comparison. Some comparative shopping would have revealed at a much earlier date that Brisbane was the powerboating community to charter out of and, all things considered, *650 the less costly charter alternative. Further investigation along the lines of Laurie Smith's suggestions might have also revealed that Horizons did little or no advertising. Petitioner never undertook to discover these facts. Where the taxpayer prepares for the business or procures expert advice but does not carry on the activity in accordance with such practices, a lack of an objective to derive profit may be indicated. Sec. 1.183-2(b)(2), Income Tax Regs.
Moreover, we consider that such an investigation would be standard for the reasonably prudent businessman investing $ 72,000 in a venture. Instead, petitioner made his investment based on conversations with boat owners which did not focus on the income, expense, and actual charterability of their boats. Instead, petitioner relied on his instructor's self-interested statement that the club could use more powerboats, on his own rough estimate of the profit point, and on the fact that none of the other boat owners stated that the charter was a bad deal. These are not criteria an experienced businessman would *651 rely on in making a substantial investment. Petitioners argue that their decision to invest in a charter boat and to acquire the Beeline was an excercise of business judgment consistent with a defined business objective. Specifically, they argue that they both agreed to invest savings, that they considered another real estate investment but decided against it because they lacked sufficient money for a down payment and were already carrying rental property at a net loss. They believed that investing in a "fixer-upper" with the potential for appreciation was a good investment objective given petitioner's background in boating. We decline to accept this argument for several reasons. First, the record is entirely silent as to any involvement in the boating activity by Mrs. Underwood. There is no evidence that she participated in any of the decisions. Second, petitioners had substantial wage and interest income. Mr. Underwood also spent a considerable amount of money on the purchase and repair of the Beeline. Given the amount of these expenditures, it is feasible that a down payment on rental property could have been made had this investment been seriously considered. Lastly, *652 petitioners' investment strategy argument, based as it is on McLarney v. Commissioner, supra, does not help them. Unlike McLarney, the facts in this case do not support a finding that petitioners considered specific alternative investments in real estate or other business endeavors. While Mr. Underwood had defined size, overhaul ability, and potential appreciation as criteria for the boat purchase, there is no indication that he developed this criteria based on the demands of the boat business or that he considered several boats on the basis of this criteria, as did the taxpayers in McLarney. Petitioners also argue that Mr. Underwood had significant boat chartering experience and that he also relied on the expertise of Horizons, Black Tie, and other service vendors. While petitioner took several courses relating to seamanship and had practical and entertainment boating experience, he attained no charter business experience prior to undertaking the activity. Furthermore, there is no evidence that petitioner sought business advice from those experts at Horizons able to give it (e.g., Laurie Smith). Additionally, petitioners presented no evidence that *653 anyone at Black Tie was an expert in the charter business or that petitioner approached such person. In either event, because both charter companies received a large commission from the charter activity, reliance on any expertise of these self-interested parties fails to indicate a profit objective. See Ewing v. Commissioner, T.C. Memo. 1989-104; Lyon v. Commissioner, T.C. Memo. 1977-239. Petitioners' assertion of reliance on repair vendors as a source of charter business expertise is without merit. 3. Time And Effort Expended By The Taxpayer In Carrying On The Activity
Petitioner devoted substantial time to restoring and repairing the Beeline during the period from June through December 1984. Sec. 1.183-2(b)(3), Income Tax Regs. His testimony and his summary of expenses convince us of this fact. Petitioner also devoted some time to chartering in 1988. However, his assertions that he continued to devote two weekends a month to chartering after the Beeline was at Horizons is not credible given Horizon's contractual obligation to care for the boat and given the infrequent and small number of charters. Moreover, *654 the record is silent as to the amount of time petitioner devoted to the charter business from August 1985 to February 1988. Considering the totality of the circumstances, we find petitioners' point unpersuasive. 4. Expectation That Assets Used In The Activity May Appreciate In Value
Petitioners failed to offer any evidence as to the measurement of the boat's expected appreciation. Sec. 1.183-2(b)(4), Income Tax Regs. No evidence was offered to show that Viking powerboats of the type at issue were increasing in value. Instead, the record shows that the boat in issue was purchased after the price was reduced, indicating a downward trend in price and that an expectation of appreciation at the time of purchase was unreasonable. Moreover, the age of the boat and its state of disrepair at purchase made it unlikely that Mr. Underwood would be able to recoup his investment plus a profit. This was subsequently borne out when petitioner offered the boat for sale at an $ 80,000 price. Furthermore, petitioner's action in listing the boat at a fair market value of $ 55,000 when signing on at Brisbane Marina suggests that his expectations regarding appreciation *655 had diminished. Petitioners argue that potential appreciation was evidenced by the fact that the boat's replacement value was $ 125,000. While we recognize that replacement value can enhance the fair market value of a used asset, particularly where the asset is in good condition, petitioners failed to present evidence that this was the case here. 5. The Success Of The Taxpayer In Carrying On Other Similar Or Dissimilar Activities
Petitioners have carried on no other similar activities. Sec. 1.183-2(b)(5), Income Tax Regs. However, they have operated rental property for all three years in issue. They have sustained sizeable losses, apart from tax deductions, with respect to this property for all years in issue. Accordingly, we find no support for petitioners on this point. 6. The History Of Income And Losses And Amount Of Occasional Profits, If Any, Which Are Earned With Respect To The Activity
Petitioner sustained no profits and sizeable net operating losses from the charter activity in years 1984-1987. More than likely, petitioner also sustained a net loss on the activity in 1988. Sec. 1.183-2(b)(6) and (7), Income *656 Tax Regs.
Those losses sustained in 1985, 1986, and 1987 were incurred beyond the start-up period for the activity; moreover, they were not attributable to unforeseen or fortuitious circumstances which were beyond Mr. Underwood's control. Sec. 1.183-2(b)(6), Income Tax Regs. Had petitioner made a proper investigation of the Alameda charter market, he would not have chartered out of Horizons and sustained operating losses from the lack of powerboat charters. Petitioner also should have foreseen that if he took the boat out of charter operations for 14 months in 1985-1986, he would probably suffer losses. Damage to the boat in late 1985 arose from personal use of the boat and was not therefore beyond petitioner's control. Additionally, since the damage to the boat in mid-1987 and the ensuing period of drydock resulted from personal use of the Beeline, we do not find that losses in that year were attributable to circumstances beyond petitioner's control. Accordingly, we find that the lack of any profits and the history of losses in years 1985-1987 are indicative of a lack of profit objective. 7. The Financial Status Of The Taxpayer
During *657 the years at issue petitioners had substantial wage income from their wholly owned corporation as well as interest income. Sec. 1.183-2(b)(8), Income Tax Regs. In 1985 and 1986, petitioners derived approximately $ 25,000 in deductions from the charter activity. This was in addition to the losses they claimed in those years from their rental property. While petitioners were not vastly wealthy, their economic status was such that they could afford to sustain two loss activities and at the same time benefit from the resulting tax advantages. These factors combined with evidence of personal use of the boat operate against petitioners. 8. Elements Of Personal Pleasure Or Recreation
The presence of personal motives in carrying on the activity coupled with evidence of recreational use of the boat weighs against petitioners. Sec. 1.183-2(b)(9), Income Tax Regs. Mr. Underwood is an avid, year-round fisherman. His actions show that he purchased a larger boat and undertook to recover part of its purchase price through use of a charter arrangement generating tax deductions. This motive is suggested from his examination of *658 the Horizons publication. Personal use of the Beeline throughout the period in question is indicated by the following: Excessive gas usage on the Horizon statements; the 1985 and 1987 damage to the Beeline which occured in a period of no charter activity; and petitioner's refusal to turn over the Beeline's log indicating hourly use of the boat. When questioned about this log, petitioner was evasive and tried to give the impression that there was no personal use of the boat. The Beeline's engine log might support his position, but petitioner did not produce this document. The failure of a party to introduce evidence within his possession which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Petitioners argue that their recreational boat use took place exclusively on the Sea Ray and that the only time they could have used the Beeline was when it was under charter because at all other times *659 it was in a state of disrepair. In light of the facts derived from the monthly statements and repair receipts we find these arguments unpersuasive. Based on all the facts and circumstances, we find that Mr. Underwood did not engage in the boating activity with the bona fide objective of making a profit. Therefore, we hold that losses claimed with respect to the charter activity will be allowed only as provided by section 183(b)(1). II. Placed In Service Issue
Section 167(a) allows a depreciation deduction for the exhaustion, wear, and tear (including obsolescence) of property used in a trade or business or held for the production of income. The period for depreciation begins when the asset is "placed in service," and a proportionate portion of a year's depreciation is allowed for that part of the first and last year during which the asset was in service. Sec. 1.167(a)-10(b), Income Tax Regs. Our holding that section 183 applies in this case precludes any finding that the boat was used in a trade or business or held for the production of income. [4] Accordingly, we do not reach the issue of when the boat was placed in service. *660 III. Investment Tax Credit Issue
Section 38 provides that a credit is allowed to a taxpayer for qualified investment in certain property. The credit is allowable for property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and which has a useful life of 3 years or more. Section 48(a)(1). Depreciation is allowable on property used in a trade or business or held for the production of income. Sec. 167(a). Our determination that petitioner's yacht chartering activity was not engaged in with the objective of making a profit is thus dispositive of this issue. Finoli v. Commissioner, 86 T.C. 697, 744-745 (1986); Pike v. Commissioner, 78 T.C. 822, 841-842 (1982), affd. in an unpublished opinion 732 F.2d 164 (9th Cir. 1984). To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. References to petitioner in the singular are references to Edward A. Underwood individually.↩
*. Petitioners declared a 1987 Schedule C loss comparable to the losses declared in 1984, 1985, and 1986.↩
2. All section references are to the Internal Revenue Code, as amended, and as in effect for the years in issue, unless otherwise indicated. All rule references are to the Tax Court's Rules of Practice and Procedure.↩
3. Sec. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) General Rule. -- In the case of an activity engaged in by an individual or an S corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) Deductions Allowable. -- In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed -- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).↩
4. We have determined that petitioners are not otherwise entitled to a depreciation deduction on their boat in 1984 and 1985 pursuant to sec. 183(b)(2) since gross income generated by the activity in those years did not exceed the amount of the tax and interest deductions allowed by respondent pursuant to sec. 183(b)(1)↩.